**UNITED STATES of America, Plaintiff,**

v.

**John MUSCATO, Defendant.**

**No. 81 CR 118.**

United States District Court,
E. D. New York.

Feb. 9, 1982.

Edward R. Korman, U. S. Atty., by David V. Kirby, Asst. U. S. Atty., Brooklyn, N. Y., for plaintiff.

Murray Richman, Bronx, N. Y., New York City, for defendant.

MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge.

Defendant was found guilty of conspiracy to unlawfully manufacture firearms and of related crimes. He moved for a new trial on a variety of grounds; the only one warranting discussion is a claim that hearsay was improperly admitted. For the reasons stated below, this claim is rejected.

## I.  Facts

The story begins with Walter Gollender, a self-styled part-time talent promotor. Though a fastidious and intelligent man, Gollender had been forced to leave the teaching profession by a psychiatric disability. In need of protection from Newark's dangers, real and imagined, he purchased a small, single shot firearm of simple design, in appearance resembling a large pen.

Gollender revealed his purchase to an acquaintance named Stanley Szostek, Jr., a former Newark police officer, who assisted his father in operating a neighborhood liquor and food store. In turn, Szostek showed the pen gun to his friend and business partner, Joseph Kirchner, a truck driver who delivered soft drinks to the store. Together, this enterprising pair had contrived to provide their community with a variety of services. They had invested in a rock concert, conducted a desultory loan-sharking business, and sold patent remedies as illicit drugs. Upon observing the simple construction of Gollender's weapon and learning that he had paid $40.00 for it, they decided to enter the arms trade.

Szostek took the prototype to a friend on the Newark police force, the defendant, John Muscato. Despairing of ever making the down payment for a new home on a modest policeman's salary, Muscato was moonlighting as a machinist in his father's basement. Muscato agreed to make copies of the pen gun in commercial quantities.

One problem with this plan was that it left Gollender defenseless. Accordingly, Muscato temporarily lent Gollender a twenty-five calibre pistol to replace his pen gun. Awed by the complexity and dangers of this new acquisition, Gollender carefully marked the pistol with a gummed label to indicate the safety position and the firing position. After the model pen gun had served its purpose, it was returned to him and he relinquished the pistol to Szostek.

As Muscato began producing pen guns, Szostek and Kirchner began casting about for markets for their product. They were particularly concerned to sell the guns outside of their home territory, perhaps so as not to embarrass the Newark police force with which they had such close connections. To this end they contacted a business acquaintance, Patrick Monteforte. Monteforte, who worked for one of the food wholesalers that supplied Szostek's store, provided Szostek and Kirchner with stolen food in repayment of high interest loans. He began looking for potential buyers of pen guns on Staten Island.

As it turned out, the demand for pen guns in this part of the Eastern District of New York was substantial. It was Monteforte's fortune to land as a customer one of the world's major armaments purchasers, the United States Government. Though presenting himself as the representative of a large New York area crime syndicate, the buyer was in fact Special Agent Matthew Raffa of the United States Treasury Department, Bureau of Alcohol, Tobacco and Firearms. As quickly as the basement factory could produce the pen guns, the Treasury Department bought them. Eventually, the government placed an order for 1,000 at $20,000.

Increasing demand made it necessary to step up production. Kirchner, accordingly, hired Steven Kasper, the crippled young grocery clerk who slept above Szostek's store, to serve as Muscato's apprentice. He was instructed to tell people, if the matter came up, that they were working on flashlights. But as Muscato and Kasper labored together they discussed such technical problems as the ballistic requirements of the barrel, and the young trainee never had any doubt that it was guns that the two were fabricating.

Delivery of the final shipment was arranged to be in neutral territory, a diner in the shadow of the George Washington Bridge, in Fort Lee, New Jersey. Szostek and Kirchner were armed and present. They were accompanied by a new recruit to the conspiracy, another former Newark policeman named Charles McDonald, now a hopeless alcoholic. His role was described as "riding shotgun," i.e., providing extra security. Muscato hid in the background with a high-powered rifle to "watch the deal go down."

To the surprise of Kirchner, Szostek and McDonald, instead of enriching them by $20,000, Raffa and his colleagues arrested them. From McDonald the federal agents recovered a .25 calibre pistol, bearing the remnants of a gummed label at the safety catch.

Eventually, all of the conspirators were rounded up and Kirchner, Gollender, Kasper and Monteforte agreed to testify for the government. During his debriefing by government officials, Gollender chanced to describe the gun that he claimed he had received from Muscato and returned to Szostek, recalling that he had placed a gummed label at the safety catch. At this point, the government agents retrieved from a safe the pistol found on McDonald. Gollender promptly identified it as the same pistol he had described.

Muscato did not cooperate with the United States Attorney. He was charged in a six count indictment with conspiracy to unlawfully manufacture and distribute firearms, manufacturing, possessing and transferring the firearms, and endeavoring to influence a witness, Kasper.

The evidence against Muscato at trial was overwhelming. He was directly implicated by Kirchner, Kasper and Gollender. Their testimony was corroborated by extensive circumstantial evidence, including damaged pen gun parts from the basement arsenal.

The defense consisted of a denial of criminal intent. The hypothesis suggested to the jury was that Muscato was a law-abiding policeman who had been making the various pen gun parts independently without knowing what they were or how they fit together. As will be seen from the exhibit set out below, after the jury had been exposed to pen guns in assembled and unassembled form over a period of days, they were probably predisposed to reject both Muscato's testimony that he was making parts without knowing their purpose and his attorney's argument that a reasonable policeman-machinist might believe he was helping manufacture pocket flashlights.

The defense position was, as noted, seriously undercut by the testimony of the oth-

er conspirators. Now, if these witnesses were not quite your run-of-the-mill mobsters, neither were they particularly solid citizens, and the defense attacked their credibility on cross-examination with considerable gusto.

Given Gollender's psychiatric history, he was by no means an ideal witness and the defense attorney had a field day with him on cross-examination. Particularly stressed was Gollender's difficulty in distinguishing reality from fancy and his suggestability. The following exchanges are typical:

Mr. Richman:

Q Now, Mr. Gollender, you are afraid of going to jail, aren't you?

A Yes, I am.

Q But you have been told, have you not, by your attorney that there is a strong likelihood that if you cooperate you will not go to jail. Isn't that right, sir?

A Not in so many words.

Q But not in so many words, but he has conveyed that clearly to you, is that right?

A It has been conveyed.

Q And you have an inordinate fear of changes as has been diagnosed by psychiatrists, isn't that right, sir?

A Y[e]s, that's correct.

Q You have many inordinate fears? . . .

A I have had, yes. . . .

Q Is it also correct, sir, that you have—would you bear with me just one moment.

You have strong feelings of inadequacy and a terror that you will lose control of yourself?

A Not ultimate control, but I have feelings like that, similar to those. Not total control, no.

I have some good judgment I think sometimes.

Q And it is true that . . . Dr. Howard Davidman, said that you have a great need to be noticed and appreciated which sometimes leads you to bizarre behavior? . . .

A It has happened on occasion, yes.

Q And on those occasions you don't know whether you behavior is bizarre or not, isn't that correct?

A I would hope it would not be, but maybe perhaps it has been.

Q You can't distinguish sometimes from reality to perhaps not so reality?

A I can distinguish from reality but I can't always predict what effect my behavior would have on other people.

Q Sometimes you become panicky and overdo some things, isn't that correct? . . .

A Sometimes.

Given this attack on Gollender's credibility, one piece of real proof took on added weight. Linking Muscato to the conspiracy was the pistol he allegedly lent Gollender, which ultimately turned up in the hands of McDonald at the time of his arrest. Gollender identified the pistol in open court as follows:

Mr. [A.U.S.A.] Kirby: Did you have any conversation with Mr. Muscato at that time?

A No, I did not. Except he gave me a .25 calibre gun while we were in the car. He came to an intersection in Irvington and he stopped and gave me the pistol. . . .

Q Mr. Gollender, I show you what has been marked as Government's Exhibit 12.

Would you take a look at that object and tell the Court and jury whether you recognize it?

A Yes, it's the gun.

Q I'm sorry?

A Yes, I recognize it as the .25 caliber pistol.

Q How do you recognize it as such?

A It has the same marking on it, same scuff mark and mainly the remnants of the gum label I marked it with, safe or unsafe. It still has a piece of the paper indicating how it was safe or unsafe.

The fact that Gollender had provided an accurate description of the pistol prior to his being shown it or being told that it had been discovered on the person of Charles McDonald provided important confirmation of his testimony. The government petitioned the court for permission to elicit this fact from Special Agent Raffa. (It was clear that Muscato would deny from the

witness stand Gollender's testimony about the source of the pistol.) The defense objected on the ground of hearsay. Ruling that it would permit Raffa to testify, the court on its own motion directed that Gollender be brought back to the courthouse and made available for cross examination concerning his out-of-court description and identification of the pistol.

For the tactical purpose of reducing the impression Raffa's proposed testimony would make on the jury, the defense brought it out on cross examination of the Special Agent. That cross examination proceeded as follows:

By Mr. Richman:

Q Sir, Mr. Raffa, did there come a time in the conversation with Mr. Kirby where you—where Mr. Gollander said to you, "I have a .25 caliber gun which I received from John Muscato which has a sticky substance on it next to the safety"?

A Yes, sir.

Q Did you make any notations concerning that particular conversation?

A No, I didn't.

Q But, you remember it?

A I most certainly do. . . .

Q Now, how many times did you speak to Mr. Gollander concerning the sticky substance?

A I spoke to him the first day that he had mentioned it, and every time thereafter that he was interviewed by. . . .

Q How many times was that?

A Eight to ten times, I believe.

Q And you kept refreshing his recollection concerning this sticky substance?

Is that right?

A No, on the contrary, he refreshed my recollection that he was the one that originally put a piece of paper on the firearm given to him by Mr. Muscato to show him where the safety position would be and the firing position. . . .

He told me first—I had never known that this, in fact, was the same gun.

He told me that the .25 caliber Titan gun that Mr. Muscato had given him, he put a small piece of paper on the frame of the gun to show when it was in the firing position or safe position.

I went into the evidence vault of the U.S. Attorney's Office upstairs and I took the 25 Titan that we had seized from Mr. McDonald.

I brought the gun in and I asked him to examine it and to tell me whether or not he recognized that.

He looked at the gun and he said, "This is the gun that Muscato gave me. And, I know that because I can see the remnants of the piece of paper that I had put on there, and it was a sticky substance that I put on the piece of paper to keep the paper on the gun."

So, when he looked at that, he said, "This is the remnants of it, and that is how I know it is the same gun."

Neither side wished to examine Gollender further. He was released on consent. We can assume that Gollender would have confirmed the agent's testimony about their conversations before the trial.

### II. Law

Two questions are presented:

First, whether, by introducing this testimony on cross examination, the defense waived any objection to its admission; and, second, whether it constituted inadmissible hearsay.

### A. Waiver

■ The fact that the testimony in question was actually introduced by the defense during cross examination does not preclude an objection on the ground that it is inadmissible hearsay. The defense was entitled to rely on a preliminary ruling on admissibility in making tactical decisions aimed at limiting the resulting damage. A timely and specific objection in limine never withdrawn sufficiently preserves the issue. F.R.Evid. 103(a)(1); *Reyes v. Missouri Pac. R. Co.*, 589 F.2d 791, 793, n.2 (5th Cir. 1979).

### B. Hearsay

In theory the admissibility of this evidence turns on two apparently distinct questions: whether the testimony was hear-

say, and, if so, whether it was admissible hearsay. In practice, however, the line between admissible hearsay and non-hearsay is often difficult to trace. The same fundamental concerns with reliability and need that shape the concept of hearsay are also expressed in the numerous exceptions to the hearsay rules, especially the catchall exception, Rule 803(24) of the Federal Rules of Evidence.

In this case, the extrajudicial declaration was both reliable and useful. Admission furthered "the end" of the Federal Rules of Evidence, "that the truth may be ascertained and proceedings justly determined." F.R.Evid. 102. It was highly "probative" and there was no "danger of unfair prejudice, confusion of the issues, or misleading the jury." F.R.Evid. 403. Moreover, both good sense and precedent supported admissibility. Nevertheless, the government's case, insofar as it rested on the out-of-court identification of the pistol found on Charles McDonald, contained both hearsay and non-hearsay components.

### 1) Was the extrajudicial declaration hearsay under the Federal Rules?

For purposes of analysis one way of treating the case with respect to the gun might be to consider only the following testimony: One member of the conspiracy testified that he had received a gun from the defendant, an alleged coconspirator, that this gun had a unique characteristic, observable upon examination, and that he had returned the gun to a third conspirator. The arresting officer testified that he had obtained a gun with the same unique characteristic from an alleged fourth conspirator. The jury could examine the gun, which had been admitted as an exhibit, to help it determine if the two witnesses were describing the same object. This part of the case presents no hearsay problem. Both witnesses testified with respect to characteristics and events they themselves observed.

The evidence was significant in two respects. First, the prosecution's ability to produce a gun matching Gollender's description lent circumstantial support to Gollender's story of having received such a gun from the defendant in furtherance of the conspiracy. Second, the fact that this gun was found on the person of another conspirator while engaged in acts furthering the conspiracy linked Muscato to the conspiracy.

What made the production of the gun useful as corroboration of Gollender's story is the improbability of his describing a gun with such a unique characteristic if he had not seen it. The physical evidence of the gun provided some assurance (unless the jury believed that this real evidence was fabricated by the prosecution) that the tale was not cut out of whole cloth. It did not by itself insure that Gollender saw the gun under the circumstances he related. If he first described the gun after having identified it while it was in the agent's possession, much of the effect of this line of proof would have been eroded. If, on the other hand, he described the gun before being shown it by a law enforcement official, production of the gun would have a substantial corroborative effect.

If we then add to the case the extrajudicial declaration of Gollender to the agent we have 1) testimony revealing the existence of a memory in the mind of a witness (a description of a gun with unique characteristics and its source), 2) a physical object matching that memory, and 3) an extrajudicial declaration made under circumstances indicating that the reported memory was acquired in a manner consistent with the witness' testimony.

It is the third leg which involved a hearsay danger since it depended on the truth of an extrajudicial declaration to the agent by Gollender. Gollender said outside of court, in essence, "the gun given to me by Muscato had a unique characteristic; this is that gun." On its face, thus parsed, his statement to the agent would appear to fall squarely within the definition of hearsay provided in rule 801(c) of the Federal Rules of Evidence:

"Hearsay" is a statement, other than one made by the declarant while testifying at

the trial ... offered in evidence to prove the truth of the matter asserted.

The fact that the extrajudicial declarant, like his auditor, was a witness subject to cross examination does not eliminate the hearsay problem. While many writers proposed treating extrajudicial declarations by witnesses as non-hearsay or as falling within a broad hearsay exception (e.g., McCormick, "The Turncoat Witness: Previous Statements as Substantive Evidence," 25 Tex.L.Rev. 523 (1947); Morgan, "Hearsay Dangers and the Application of the Hearsay Concept," 62 Harv.L.Rev. 177, 192 (1948); Model Code of Evidence, Rule 503(b); Uniform Rules of Evidence, Rule 63(1) (1953)), the Federal Rules reject this approach except in special cases. *See* F.R.Evid. 801(d)(1); 803(5).

Nor is the hearsay issue under the Federal Rules eliminated by the fact that a declaration is offered as evidence of a mental state—memory. Rule 803(3) permits the admission of extrajudicial declarations to show mental states contemporaneous with the declarations themselves. Although evidence of the extrajudicial declaration arguably was offered to explain a then current mental state, the rule is specifically inapplicable to evidence of memories offered "to prove the facts remembered." It was certainly reasonable for a trier to use Gollender's statement to the agent as probative of the fact remembered—that he received this unique gun from the defendant. *Cf. Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933).

Despite the fact that it could be analyzed as hearsay under the Federal Rules of Evidence, this extrajudicial declaration posed minimal hearsay dangers; it was highly probative while being essentially corroborative in function. Admitting it may be justified under a number of different theories: that it was circumstantial rather than testimonial evidence and, therefore, was not hearsay; that it was offered on the issue of credibility rather than for its truth as evidence-in-chief; and that it was admissible under Rule 803(24).

2) The extrajudicial declaration as circumstantial evidence

One way of characterizing the extrajudicial declaration in this case is as "circumstantial non-assertive use" of the utterance "to show state of mind." Statements used in this way, according to Professor McCormick, need not be denominated hearsay. This, he wrote, is especially true of "declarations evincing knowledge, notice, consciousness or awareness of some fact, which fact is established by other evidence in the case." McCormick, Evidence, § 249, p. 592 (2nd Cleary Ed.1972). According to this analysis, the extrajudicial declaration was offered not to prove the truth of the proposition asserted—the description of the gun—but to prove that the declarant had knowledge of the truth of that proposition. Because McCormick's discussion of the "trace" on the mind theory has had great influence, it is set forth in its entirety:

When the existence of knowledge is sought to be used as the basis for a further inference, caution is required lest the hearsay rule be infringed upon. Thus, in a Wisconsin case [*Bridges v. State*, 247 Wis. 350, 19 N.W.2d 529 (1945); Note, 44 Mich.L.Rev. 480. Footnote in treatise.] evidence was received in a trial for mistreatment of a little girl, that the girl in reporting the incident gave a description of the house and its surroundings and of the room and its furnishings, where the mistreatment occurred. Other evidence showed that this description fitted exactly the house and room where the defendant lived. Morgan suggested that this evidence depended for its value upon "the observation, memory and veracity" of the girl and thus shared the hazards of hearsay. [Morgan, Evidence 1941–1945, 59 Harv.L.Rev. 481, 544 (1946). Footnote in treatise.] It seems, however, that the testimony had value without regard to her veracity. Other witnesses had described the physical characteristics of the house. Her testimony was not relied on for that, but to show her knowledge as a "trace," as it were, on her mind of her visit at the time of the crime. Signifi-

cantly the undisputed proof excluded the possibility of other means by which she could have acquired the knowledge, and thus the hearsay dangers were eliminated.

The evidence before us is much like the extrajudicial declaration at issue in *Bridges v. State*, 247 Wis. 350, 19 N.W.2d 529, 534 (1945), the case McCormick cited as the paradigm. A seven year old child described to a police officer several exterior and interior details of the house in which she was allegedly assaulted. Subsequently, it was discovered that this description closely fit defendant's home. The court, relying on 6 Wigmore §§ 1788, 1790, 1791 (3rd Ed.1940), reasoned that the statement to the police officer was circumstantial evidence of the child's state of mind which, in turn, was evidence of what caused that state of mind.

Additional support for such treatment of extrajudicial declarations (or behavior) evincing knowledge may be sought in *Kinder v. Commonwealth*, 306 S.W.2d 265 (Kentucky Court of Appeals, 1957), in which a defendant was convicted of larceny on the basis of his young son's knowledge of the location of the cache of stolen goods. Another such case is *State v. Galvan*, 297 N.W.2d 344 (Iowa Supreme Court, 1980), a murder case in which the court approved admission of a description by defendant's ex-wife of their two year old daughter's apparent unreflective re-enactment of the killing while the youngster was at play. While the *Galvan* court based its ruling on a "res gestae exception," *id.* at 347, and rejected the *Bridges* rationale, the fact pattern places the case in the *Bridges-Kinder* line. *See* Note, Nonassertive Conduct and State of Mind Evidence in Iowa after *Galvan*: *Bridges* Over Troubled Hearsay Waters, 66 Iowa L.Rev. 985 (1981); *cf.* Park, "*McCormick on Evidence* and the Concept of Hearsay: A Critical Analysis Followed by Suggestions to Law Teachers," 65 Minn.L.Rev. 423, 437–441 (1981) (criticizing McCormick's analysis of *Bridges*).

The *Bridges* approach to cases of this sort cuts the gordian knot of hearsay. Not surprisingly, however, it leaves a few loose ends.

First, it involves an oversimplification of the function of the declaration involved. It is not quite accurate to characterize the extrajudicial declarations in any of these cases as mere descriptions of places of things or of "traces" on the mind. They are essentially accounts of events implicating criminal defendants and, ultimately, they will be used by the trier in support of the accounts they suggest, even if, as an intermediate step, they indicate only states of mind consistent with the truth and accuracy of these implied accounts. Thus, there is a sense in which they are offered to prove the proposition asserted.

Second, it does not sufficiently distinguish between the use of an extrajudicial declaration as evidence of past state of mind and its use as evidence of current state of mind. Yet there may be a difference in reliability between these two uses of an extrajudicial declaration. Where a prior statement is adduced to show the basis of a current memory trace, it can be checked and tested against the current statement. This is not necessarily the case for evidence such as that offered in *Bridges* or *Galvan*, concerning an ephemeral mental impression. In the present case, the extrajudicial declaration corroborates in-court testimony. In a case like *Galvan*, where the extrajudicial declarant is unavailable to testify, that is not the situation. This is cause for a sense of disquiet which cannot be adequately dispelled since there can be no in-court current explanation and testing of the declarant.

Third, and most important, a rule admitting all such material ignores important distinctions in reliability. There are dangers implicit in allowing into evidence material like that offered in *Bridges, Kinder* and *Galvan* —dangers which McCormick acknowledges but which the trier may fail to give proper weight. The ability of declarants to recall details observed in incriminating situations, before being exposed to those details by law enforcement officials or others, is bound to impress a trier. The probative force of such evidence, however,

is dependent on the assumption that the extrajudicial declarant had no other way of learning the details described than by having witnessed the events described. If declarants in such cases were exposed to the objects they identified in some fashion other than one which squares with their implied account, or if the information was otherwise suggested to them, as by the form of questioning or what they inadvertently overheard, then their extrajudicial descriptions have little probative force. There is always a danger that even the least suggestive auditor will read into a conversation details put forward by one party and adopted by the other as his own thoughts. *See, e.g.,* E. Loftus, Eyewitness Testimony, 98 ff. (1979) ("highly credible people can manipulate others more readily"); Hofstadter, "About Two Kinds of Inquiry," 246 Scientific American 18, 23 (1982) ("the same system [of thought based on intelligent use of context and memory] that enables us to creatively find meanings and to make new discoveries also makes us extremely vulnerable .... [T]he manipulator may be conscious of his deception; but often he too is a victim of personal validation.").

Where the assumption that the extrajudicial declarant has not been previously exposed to the objects or events in question or their description remains unchecked by vigorous cross-examination or other evidence tested under adversarial fire, dangerous consequences can result. A well-documented Swedish case presented facts analogous to those in *Bridges* but with a twist. While a young boy claiming to be the victim of an assault could accurately identify the interior of the accused's apartment, it turned out that he had been previously exposed to an identical apartment. Then further investigation demonstrated inconsistencies in the boy's story that revealed that the accusation was fabricated in an attempt to deflect attention from the child's own disobedience. Trankell, "Was Lars Sexually Assaulted?", 56 Journal of Abnormal and Social Psychology, 385 ff. (1958); A. Trankell, Reliability of Evidence, 106 ff. (1972).

One way of coping with the incompleteness of the *Bridges* approach is to turn to criteria of admissibility other than the hearsay rule—i.e., those of Rule 403—for evaluating circumstantial non-assertive uses of extrajudicial declarations. *See, e.g.,* Note, Theoretical Foundations of the Hearsay Rule, 93 Harv.L.Rev. 1786 (1980). A federal court following this approach in a case with the *Galvan* fact pattern would exclude testimony about the daughter's extrajudicial behavior because it lacked such supplementary guarantees of reliability, even though Rule 801(a) excluded it from the Federal definition of hearsay. *Cf. United States v. Wilson*, 532 F.2d 641, 645–6 (8th Cir. 1976); Note, Nonassertive Conduct and State of Mind Evidence in Iowa after *Galvan: Bridges* Over Troubled Hearsay Waters, 66 Iowa L.Rev. 985 (1981). While the mother in *Galvan* was a witness at the trial, even assuming she was credible, there may be too many unexplorable nuances and possibilities of error through unconscious suggestion to run the risk of allowing the young child's indirect hearsay as evidence-in-chief. Children of that age are all ears and may overhear adult conversations which they may be unable to differentiate from their own original sense impressions.

*Bridges* is halfway between *Galvan* and the instant case because in *Bridges* the seven-year-old testified, although the testimony of such a youngster must usually be treated skeptically in view of the added problems of influencing such a witness. *Cf., e.g., Hollaris v. Jankowski*, 315 Ill.App. 154, 42 N.E.2d 859 (1942) (court refused to hear eight-year-old child because of suggestibility; he had heard so many conversations about the event that he could not differentiate what he had heard from what he had seen). Much would, of course, depend upon the court's evaluation of the witness. Moreover, in *Bridges* the circumstances were such as to make it highly unlikely that the details of the description could have been derived from anything but the child's experience of the event in question.

The same court that would exclude in *Galvan* and would be *dubitante* in *Bridges*

would admit the extrajudicial declaration in the case now before us. The out-of-court declaration is accompanied by the declarant's in-court identification and availability for cross examination as well as the auditor's testimony respecting the declarant's limited opportunities for prior contact with the object identified.

### 3) The extrajudicial declaration as evidence of credibility

The government's contention that defendant Muscato had provided Gollender with the gun ultimately used by McDonald was dependent in the main upon the present recollection at the trial of Gollender and Special Agent Raffa; both testified. The principal role of the extrajudicial declaration was, in concert with Special Agent Raffa's testimony as to the conditions of the declaration, to bolster Gollender's credibility. It demonstrated first, that Gollender's account of receiving the gun was not an hallucination and, second, that it was not inspired by being shown the gun during debriefing or by attempts to buy his freedom through testimony agreeable to the prosecution.

This extrinsic evidence of a prior consistent statement was adduced after Gollender's credibility was vigorously attacked on cross examination. Part of this assault was aimed at impugning Gollender's ability to reliably perceive, remember and report reality. The other part was an onslaught on his motives, conscious or unconscious, in testifying as he did. Proof of the extrajudicial declaration, showing that his detailed account was neither recent in origin, a result of suggestion by law enforcement officials, nor wholly a product of his imagination, was directly responsive to these attacks. As such it was a "prior statement by a witness . . . and consistent with his testimony and . . . offered to rebut an express or implied charge of recent fabrication or improper influence or motive" and so non-hearsay under Rule 801(d)(1)(B).

Even if it did not fall within the definition of non-hearsay in Rule 801(d)(1)(B), however, the extrajudicial declaration would be admissible on the issue of Gollender's credibility. As Judge Friendly noted in *United States v. Rubin*, 609 F.2d 51, 69 (2d Cir. 1979) (concurring):

> consistent statements used *only* for rehabilitation are never hearsay since they are not "offered in evidence to prove the truth of the matter asserted," Rule 801(c), but only for the fact of their having been made, 4 Wigmore, [Evidence § 1132 at 294 (Chadbourn rev. 1972) and cases cited in n.1]. By allowing *certain* prior consistent statements to be used as proof of the matter asserted, as they could not previously have been, Rule 801(d)(1)(B) does not imply that others not meeting that standard can never be used for rehabilitation. (Emphasis in original.)

Under the circumstances of this case, if the extrajudicial declaration was admissible as to credibility alone, no complaint will be heard that it was admitted for general purposes as well. A general objection was lodged against the introduction of this evidence on grounds that its admission would violate the hearsay rule. No specific request was made pursuant to Rule 105 that its admission should be limited to the issue of credibility. Error, if any, was therefore waived by failure to meet the requirement of Rule 103(a)(1) that there be a timely and specific objection.

### 4) Rule 803(24)

The twenty three specific classes of exceptions to the hearsay rule enumerated in Rule 803 identify situations in which there is a circumstantial guarantee of an extrajudicial declarant's credibility and special need for this class of hearsay. Rule 803(24), the catchall exception, is designed to permit the court to identify situations not enumerated in the other exceptions in which unique circumstances supply proof of reliability and need. Courts have been particularly prone to rely on Rule 803(24) to admit hearsay when the declarant is available and subject to cross examination and the statement in question poses no special danger that the trier is likely to misevaluate. *See,*

e.g., United States v. Barnes, 586 F.2d 1052 (5th Cir. 1978); United States v. Williams, 573 F.2d 284 (5th Cir. 1978); United States v. Leslie, 542 F.2d 285 (5th Cir. 1976); United States v. Smith, 571 F.2d 370 (7th Cir. 1978) (probation revocation hearing); United States v. Iaconetti, 406 F.Supp. 554 (E.D. N.Y.), aff'd, 540 F.2d 574 (2d Cir. 1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); State Farm Mutual Auto Ins. Co. v. Gudmunson, 495 F.Supp. 794, n. 1 (D.Mont.1980); Grimes v. Employees Mutual Liability Ins. Co. of Wisconsin, 73 F.R.D. 607 (D. Alaska 1977).

Here, as provided by 803(24), there were "circumstantial guarantees of trustworthiness" "equivalent" to those in Rules 803(1) to 803(23). Corroborating circumstances included the physical features of the gun readily observable by the jury and the fact that it was under lock and key from the time of the initial arrest to the time of the extrajudicial declaration. In addition the fact that both parties to the out-of-court conversation were available for full cross examination on the details of the statement and the surrounding circumstances as well as on the events it described provided extraordinary guarantees that the jury could properly evaluate the extrajudicial declarant's credibility at the time he made the declaration. There are in addition four explicit criteria for the admissibility of testimony under Rule 803(24) beyond the presence of guarantees of reliability.

First, the statement must be "offered as evidence of a material fact;" "material" as used in this provision means "relevant" as defined by Rule 401. To the extent that this testimony is to be considered hearsay, it is offered as evidence of the proposition asserted—that the gun declarant received from the defendant looked a certain way and that this was the gun—if true, a highly probative piece of evidence. Even if this statement was offered merely as corroboration of the witness' later identification in court, it is still relevant under Rule 401.

Second, the statement must be "more probative on the point for which it is offered than any other evidence procurable

through reasonable efforts...." Even though the evidence may be somewhat cumulative, it may be important in evaluating other evidence and arriving at the truth so that the "more probative" requirement cannot be interpreted narrowly. For its limited purpose of fixing the time of declarant's first contact with the gun as prior to the arrest of the conspirators, the extrajudicial declaration was highly probative.

Third, the admission of the evidence must serve "the general purposes" of the Federal Rules of Evidence "and the interests of justice," as set forth in Rule 102. This requires, in simple terms, that the evidence shed more light than it shades. More specifically, it requires that the evidence conform to the general standards of admissibility—relevance and lack of prejudice—enunciated in Rules 401, 402 and 403. This, the evidence in question certainly did. It was not unfairly prejudicial; there was no substantial danger of the jury misconstruing or overvaluing it; it was confirmed by subsequent testimony of the extrajudicial declarant; and both the declarant and the auditor were available for cross examination on the statement and all relevant events. No right of confrontation could possibly have been violated. There was ample "showing of particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); cf. California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

Finally, the party offering the statement must have provided the adversary with "a fair opportunity to prepare to meet it." Notice before trial was not given, but no objection on this ground was made nor could it have been made with any force since the court would have granted a continuance if one had been requested. None was requested or granted because none was needed. By calling the agent himself and by refusing the opportunity to have Gollender take the stand after he was produced in court on order of the court, defendant effectively waived any right to claim lack of notice. See, e.g., Furtado v. Bishop, 604 F.2d 80, 93 (1st Cir. 1979), cert. denied, 444

U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980); *United States v. Iaconetti*, 540 F.2d 574, 578 (2d Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); *United States v. Bailey*, 581 F.2d 341, 348 (3rd Cir. 1978); *United States v. Leslie*, 542 F.2d 285 (5th Cir. 1976).

### III. *Conclusion*

█ Gollender's out-of-court statement was properly admitted. Whether or not this extrajudicial declaration is denominated hearsay turns on how one characterizes its function in the development of the government's case. It may be viewed as admissible hearsay, non-hearsay evidence-in-chief, or non-hearsay insofar as it is admissible on the issue of credibility. Admission of evidence of this sort does not derive its ultimate justification from any one theory, but from notions of reliability and the ability of the trier to properly evaluate probative force.

Absent a constitutional issue of confrontation—and there is none here—the central question is whether the jury could accurately evaluate the probative value of Gollender's out-of-court statement. Essentially this is an issue implicated in Rules 401 to 403, requiring the court's exercise of sound judgment and discretion. *See, e.g., United States v. Barbati*, 284 F.Supp. 409, 413 (E.D. N.Y.1968) ("We cannot permit the mechanical and unreasoned application of the hearsay rule to deny evidence vital for our search for the truth."). In the circumstances of this case there can be no doubt that admitting this evidence enhanced the search for the truth without any possible unfairness or prejudice to the defendant. Motion for a new trial denied.