### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**Michael C. SCOTT a/k/a Michael E. Cole and Raymond L. Dirks, Defendants.**

### No. 82 Civ. 1166 (WCC).

United States District Court, S.D. New York.

June 14, 1983.

Donald N. Malawsky, New York Regional Administrator S.E.C., New York City, for plaintiff; Anne C. Flannery, Linda N. Cassano, William G. McCabe, Sherry L. Stenson, Legal Intern, New York City, of counsel.

Michael C. Scott, pro se.

Arkin & Arisohn, P.C., New York City, for defendant Raymond L. Dirks; Stanley S. Arkin, Marc Bogatin, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This case involves yet another skirmish in the long-running battle between the Securities and Exchange Commission (the "SEC" or the "Commission") and defendant Raymond L. Dirks ("Dirks"), a well-known, if controversial, securities analyst. In February of 1982, the SEC commenced this action seeking to enjoin Dirks, defendant Michael C. Scott ("Scott") and three other defendants from further violations of Section 17(a)

of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The Commission alleges that defendants committed such violations by causing the securities of Cayman Islands Reinsurance Corporation, Ltd. ("Cayman Re") to be sold pursuant to a materially misleading prospectus. According to the complaint, defendants affirmatively misrepresented in the prospectus that: (1) Cayman Re would invest the proceeds of the offering primarily in liquid, fixed income securities; (2) Cayman Re would manage its own portfolio of investments; and (3) Cayman Re would enter the reinsurance business. The SEC further alleges that the prospectus was materially misleading because it failed to disclose that (1) there was a pre-existing agreement between Cayman Re and John Muir & Co. ("Muir"), the underwriter of the Cayman Re offering in which Dirks was a limited partner at the time, to invest as much as $2.5 million of the proceeds of the offering in speculative securities recently underwritten by Muir; (2) there was a plan to invest the remaining proceeds in a Canadian real estate venture (the "Marsta Cessions transaction"); (3) Scott, Cayman Re's chief executive officer, had been convicted of fraud, which adversely affected Cayman Re's ability to obtain a reinsurance license in the Cayman Islands; and (4) during the prospectus delivery period approximately $1.6 million of Cayman Re's proceeds from the offering were invested in new equity securities that had been underwritten by Muir, thus resulting in a duty to amend the prospectus to disclose this material use of the proceeds.

Before trial, the SEC resolved its claims against three of the defendants by stipulation and order.[1] Dirks, however, has vigorously contested the Commission's allegations both at the trial, which was conducted

1. On November 30, 1982, Final Judgments of Permanent Injunction were entered against Cayman Re and Paul V. Miller ("Miller"), Chief Operating Officer of Cayman Re. Also on that day a Final Order was entered upon the Consent on Undertaking of William E. Thompson ("Thompson"), a founder and director of Cay-

man Re. On December 6, 1982, this Court entered a Final Judgment of Permanent Injunction by Consent against Carl John Peterson ("Peterson"), a Muir employee. In consenting to the orders and judgments, defendants neither admitted nor denied the allegations of the Commission's complaint.

by this Court without a jury, and in his post-trial submissions. Despite his aggressive defense, Dirks did not testify during the case but instead relied on his Fifth Amendment privilege against self-incrimination, as did Scott during pretrial discovery. Although the SEC presented its evidence against Scott at trial, he chose not to appear for the proceedings or to file post-trial papers. He has, however, indicated to the Court that he disputes the accuracy of the Commission's allegations.[2]

This Opinion incorporates the Court's findings of fact and conclusions of law, Rule 52, F.R.Civ.P. For the reasons set forth below, I conclude that Scott violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5 and accordingly should be permanently enjoined from future violations thereof. The Court also finds that Dirks violated those antifraud provisions of the securities laws but declines to issue an injunction against him because of the SEC's failure to establish a reasonable likelihood that he will commit future violations. In explaining these conclusions, the Court will first review generally the evidence adduced at trial concerning the Cayman Re offering. Following that background discussion, the Court will then set forth separate conclusions concerning the individual defendants based on the admissible evidence as to each. Finally, the Court will detail the various considerations that justify the granting of equitable relief against Scott and the denial of such relief against Dirks.

I. *Background*

Cayman Re is the embodiment of an idea developed by William E. Thompson ("Thompson") and others to incorporate an offshore reinsurance company that would be capitalized through a public offering in the United States. Reinsurance is a segment of the insurance business in which an insurer who has accepted a risk then passes a portion of that risk to another company, a procedure not unlike that of a bookie laying off his bets. Thompson and the other founders put up the initial capitalization of $100,000 and Cayman Re was incorporated on June 26, 1979 under the laws of the Cayman Islands.

Even before the company was incorporated, Thompson approached Muir about underwriting Cayman Re's initial public offering. Thompson, who served as Cayman Re's chairman of the board, testified that Muir was selected because that brokerage house had recently underwritten a new issue for Aneco Reinsurance Co. Ltd. ("Aneco"), which the Cayman Re principals believed was similar in concept to their own project. Specifically, Thompson understood that Dirks had been involved in the Aneco underwriting and thus his initial discussions and correspondence about Muir's involvement with Cayman Re were with Dirks.

During the spring of 1979, Thompson and Dirks developed the preliminary plans for the offering and negotiated the terms on which Muir would be retained as underwriter.[3] Ultimately, on August 22, 1980, Cayman Re and Muir executed a letter of intent under which Muir would underwrite $12 million of Cayman Re securities on a firm commitment basis. As then contemplated, the arrangement involved the issuance of 1,750,000 shares at $7.50 per share. Thompson signed the letter of intent on behalf of Cayman Re and John S.

**2.** Scott was served personally with a copy of the Summons and Complaint on April 2, 1982 in Toronto, Canada. Although he has never filed an answer, Scott, acting *pro se,* has submitted certain papers to the Court setting forth his opposition to the SEC's position. Moreover, at Scott's request, the Court appointed counsel to represent him in connection with the SEC's motion to compel Scott to testify on the basis that he had waived his privilege against self-incrimination. That motion was denied by the Court on December 7, 1982. Because Scott had appeared, albeit somewhat sporadically,

and contested the Commission's allegations, the Court refused to enter a default judgment against him and instead directed the Commission at trial to put in its evidence against him so that a determination could be made as to whether a *prima facie* case was established.

**3.** On May 8, and May 17, 1979, Thompson wrote Dirks thanking him for his continued interest in the proposed underwriting. Dirks himself made copious notes about the underwriting on a two-sheet Muir trading summary dated June 1979.

Sullivan, a general partner, executed the document for Muir.

In addition to developing plans for the underwriting itself, Thompson and the other Cayman Re principals also worked closely with Muir in establishing the company's investment objectives for the underwriting proceeds. The initial draft prospectuses, which Thompson prepared and sent to Dirks, stated that Cayman Re would invest these funds in liquid, fixed income securities. At one of the early meetings concerning the investment strategy, however, Dirks suggested that Cayman Re invest a portion of the proceeds in equity securities and that Muir, because of its track record, be retained as investment adviser in connection with such equity acquisitions. After some consideration, Cayman Re accepted this proposal at a January 10, 1980 meeting in Muir's offices, which was attended by Thompson, Dirks, Robert Sterling ("Sterling"), a Muir employee, P. Bruce Wright ("Wright") and Gerald Freedman ("Freedman"), partners in Trubin Sillcocks Edelman & Knapp ("Trubin Sillcocks"), legal counsel to Cayman Re for the underwriting. During that meeting Thompson announced Cayman Re's decision to have Muir manage a portion of the proceeds. The remaining funds, Thompson reported, were to be invested by two other managers, J. Henry Schroder and Continental Illinois Bank. In a January 14, 1980 memorandum to the Cayman Re principals,[4] Thompson summarized the events of the January 10 meeting and gave the following report on the investment situation:

It became obvious that one factor key to the completion of this project was allowing Muir to in fact have a part of our portfolio for investment.

I was glad to have been able to say that in our Cayman directors meeting we decided to give a portion ($3–5 million) of our funds to the other two managers, allowing for Muir to have a portion. We told Muir they could invest some of our funds from the beginning. No figure

was discussed, but I would hope no more than 15–25% would be under their management (see management of investment funds memorandum accompanying this memo).

They agreed that their portion would also fall under Continental Illinois' custodial management account, so that we can be rendered a master account once a month.

Despite his statement to the Cayman Re principals that the Muir investment was "key" to the completion of the offering, Thompson testified at trial that Dirks never stated to him that Muir's retention as investment adviser was a necessary precondition to its participation in the underwriting. Nevertheless, after Cayman Re decided to invest a portion of the proceeds with Muir, a series of meetings was held to develop investment guidelines. At one of these meetings, held on March 4, a disagreement arose between the Cayman Re principals and Sterling, who was working on the investment side of the project for Muir. In attendance at the meeting were Thompson, Wright, Freedman, Dirks, Sterling, Paul V. Miller ("Miller"), Cayman Re's president, and Henry Rothman ("Rothman") of Booth Lipton & Lipton ("Booth Lipton"), Muir's legal counsel for the underwriting. Sterling took the position that Muir, as investment manager, should be bound only by very loose guidelines. He insisted that the sole restriction placed on Muir by the prospectus should be the statement that Muir would do its best to maximize results. Not surprisingly, the Cayman Re principals objected to this vague language and turned to Dirks to resolve the matter. Dirks agreed that concrete investment guidelines were necessary and told Sterling that his position was "crazy." Dirks basically agreed with Thompson's proposed guidelines, which Wright listed in a March 4 conference memorandum:[5]

There was discussion as to the investment guidelines which would be imposed on John Muir & Co., as follows:

---

4. Only the contents of the memorandum were admitted into evidence pursuant to Rule 803(5), F.R.E.

5. This memorandum also was admitted pursuant to Rule 803(5), F.R.E.

(a) No investments would be placed with companies with less than $25 million in assets.

(b) Only securities of companies traded on the New York Stock Exchange, the American Stock Exchange and the NASDQ could be invested in.

(c) No more than $300,000 would be invested in any one issue, and no more than 10% of any new issue would be invested in.

(d) John Muir & Co. would strive to keep the turnover of the fund under 50% unless unrealized profits made such a position unsound.

Mr. Thompson then asked Mr. Dirks what types of securities he would be investing in and whether there would be investment in companies listed on the American and New York Stock Exchanges. Mr. Dirks said that half of the assets utilized would be listed companies such as Travelers, etc., i.e., insurance and financial companies, and that half would probably be over the counter issues, again concentrating on insurance and financial issues.

Despite the consensus on the preliminary investment guidelines, the Cayman Re principals continued to be dissatisfied with Sterling's attitude toward the project. They voiced this concern to Dirks and asked him to allow someone else to work on the deal from the investment end. Dirks agreed to the change and Sterling was removed from the project.

In its preliminary prospectus, filed with the Commission on April 11, 1980, Cayman Re disclosed that Muir would invest one-third of the proceeds "to optimize the total return thereon through a combination of capital appreciation and current income." Plaintiff's Ex. 204B at 19. The prospectus further revealed Muir's investment guidelines, which substantially comported with those agreed on at the March 4 meeting. After reviewing the registration statement, the Commission sent a comment letter to

counsel regarding the sufficiency of the disclosure. The comment letter, a copy of which was sent to Dirks by Rothman, stated, *inter alia,* that the prospectus should detail more specifically the potential conflicts of interest and should make clear that the investment advisers would earn substantial fees regardless of the success of their investment strategies.

Sometime around the first part of May 1980, John Peterson ("Peterson") became actively involved in selling the underwriting for Muir. In a May 9, 1980 memorandum to the Cayman Re principals, Thompson described Peterson as Muir's "top sales person" and stated that he would be in charge of the account.[6] Thereafter, plans were made for Cayman Re's "dog and pony show," a trip made by certain of the principals and representatives of the underwriter to various cities in order to woo large investors. The Cayman Re "show" took place during the first part of June and was staffed by Peterson and Nancy Rochford ("Rochford") on behalf of Muir. Thompson testified that while the trip was in progress, Peterson called Dirks to report on their efforts to sell the underwriting. For his part, Dirks made "due diligence" trips for Cayman Re to London and to the Cayman Islands.

Although Thompson was optimistic after the road show that Cayman Re would go public during the summer of 1980, Dirks called Thompson and Miller in July to recommend restructuring the underwriting. Because market conditions were soft for insurance stocks, Dirks proposed that the offering be reduced from $12 million to $6 million, and that it be sold in units consisting of one share of common stock and one warrant at a unit price of $1. Thompson testified that after Dirks promised to oversee the offering personally, Cayman Re reluctantly agreed to the changes.

Even as restructured, however, the underwriting did not move forward. In early

6. Peterson, as Muir's top salesperson, earned a 1980 salary of $165,803.08. Muir's two general partners, Robert Smith and John Sullivan earned $39,999.96 and $29,875.07, respectively,

that year. By contrast, Dirks, in his position as a 20% limited partner in Muir, earned $995,-153.49.

September, Dirks telephoned Thompson to tell him that there were still problems with market acceptance of the issue. Dirks suggested that he bring in a group of Canadian investors who could purchase up to 60 per cent of the offering. Thompson responded to this proposed change by Telex asking Dirks to proceed with the underwriting without the Canadians. Thompson believed that the delay caused by bringing in the new principals would merely complicate the already protracted efforts to take the company public.

On September 15, Thompson and Miller attended a meeting at Muir's office to discuss Dirk's proposal and to meet Scott, who purportedly represented the Canadian investors. Also present at the meeting were Dirks, Peterson, legal counsel for both Cayman Re and Muir and Murray Frank ("Frank"), Muir's designee to the Cayman Re board of directors. After Dirks introduced Thompson and Miller to Scott, the rest of the meeting was spent discussing Scott's background and his ideas on the Cayman Re project. Scott stated that he had extensive experience in the insurance field and mentioned that he had been a consultant to several Canadian insurance companies and to Muir.[7] What Scott failed to mention, however, was his 1961 fraud conviction in Canada for diverting $172,931.53 from the Canadian Shield General Insurance Company while he was its presi-

dent. During the meeting, Scott expressed his opinion that the legal fees incurred by Cayman Re were too high and that there was too much dilution by insiders. Moreover, Scott stated that because he had substantial experience as a portfolio manager, none of the investment managers, including Muir, would be needed.

Although the discussions were continued the following day, there was no immediate decision made concerning the Canadians' involvement. One week later, however, Thompson wrote Scott stating that Cayman Re had approved certain of his proposals. Despite Scott's entry into the Cayman Re project, apparently no due diligence inquiry was ever conducted into his background. Wright understood that Rothman would investigate the Canadians although Rothman claims not to recall any conversations with Wright concerning due diligence with respect to Scott.

On September 24, 1980, Cayman Re filed Amendment No. 2 to its registration statement. After the SEC indicated that it had no further comments on the filing and was prepared to declare it effective, Thompson sent an October 1 telegram to the other Cayman Re principals announcing that the offering was imminent. The offering was again delayed, however, when Scott requested further changes in its terms. On October 17, Wright circulated a memorandum to Thompson, Miller and the other

---

7. Thompson testified that Scott did not identify the projects on which he had worked with Muir. The Commission, however, presented evidence of payments by Muir to Scott in several instances that provide more questions than answers. For example, the first payment invoice states that Scott was paid for services rendered "with regard to Cayman Re." Plaintiff's Ex. 351. The invoice, however, is dated August 27, 1980, nearly one month prior to Scott's involvement in the company. Muir also paid Scott for professional services rendered in connection with a company called Consorcan Resource Development Services Ltd. ("Consorcan"). At trial, A.J. Reynold Mastin ("Mastin"), a Canadian attorney, testified that he performed some start-up work on Consorcan for Scott but to Mastin's knowledge, the company was never incorporated. Coincidentally, Mastin was also one of the seven Canadian investors named in the Final Prospectus as prepared to buy a substantial interest in Cay-

man Re. Mastin testified that although he investigated the possibility of investing in Cayman Re, he decided against it and communicated this decision to Peterson prior to publication of the prospectus. Nevertheless, his name appeared in the document without his authorization.

Muir's payments to Scott for the months of August, September and October of 1980 totalled $11,242.05. From November of 1980 to March of 1981, Scott received another $15,000 from Muir for services allegedly rendered in connection with Consorcan. In transferring the money, Scott and Muir engaged in a mystifying series of transactions. After submitting an invoice for his services and expenses, Scott would receive a check chargeable against Muir's Travel and Entertainment Expense Account. Scott would then deposit the check into his account at Muir after which the company would issue a new check or wire funds back to Scott.

Cayman Re principals stating that Scott and the other Canadian investors were insisting that they be allowed to add enough directors to the board to give them control and that Scott be named chief executive officer ("CEO") of Cayman Re. Wright, who apparently learned of these demands in a conference call with Scott, Sterling and Peterson, further stated that Scott wanted to discontinue the investment management contracts so that he could handle investment of the proceeds. This proposal, one of Scott's original ideas, had not been adopted earlier.

The Cayman Re principals acquiesced in these changes and Wright incorporated them in a draft of Amendment No. 3 to the registration statement. The revised draft (1) identified Scott as CEO; (2) identified seven new directors, including Scott, to be added to the existing six-director board; (3) stated that Cayman Re would manage its own investment portfolio; and (4) listed seven Canadian residents as having indicated their interest in purchasing a substantial amount of the Cayman Re stock. However, one of these individuals, A.J. Reynolds Mastin ("Mastin") testified at trial that he had decided prior to the filing of the Amendment against investing in Cayman Re and had notified Peterson of that decision. See note 7, *supra.*

On November 18, the Cayman Re board met in Toronto and approved all of the changes incorporated in the Amendment. Thereafter, Scott became CEO while Miller was moved to the position of chief operating officer. The board also resolved to terminate Cayman Re's investment management contracts with Muir and the other two managers.[8]

After approval by the board, Amendment No. 3 was filed with the Commission, which declared it effective on December 17, 1980. The day before, however, Thompson received a phone call from Peterson, who insisted that Thompson place an additional order for the Cayman Re units once the offering began. According to Thompson, Peterson stated that he had to agree to purchase an additional 150,000 units before Muir would go forward with the offering. Thompson, who stated that he could not afford such a purchase, called Dirks to tell him that he was being pressured to buy additional units. Dirks responded by asking Thompson what he could afford and when Thompson stated that he could handle another 75,000 units, an order for that amount was placed in his name.

The final prospectus was declared effective on December 17 and Muir immediately began selling the units. Prior to the effective date, Muir received an opinion letter from Trubin Sillcocks stating that the law firm had no reason to believe that the prospectus contained any false or misleading statements. This opinion, which Trubin Sillcocks reaffirmed on December 29, the day the offering closed, was never withdrawn.

The prospectus states that "[t]he Company expects that the net proceeds of this offering will be invested principally in liquid, fixed income securities...." Plaintiff's Ex. 224B at 17. The prospectus further provides that

> [t]he Company's initial investment objectives will be to maintain liquidity and preserve its capital while optimizing the total return thereon through a combination of current income and, to a lesser extent, capital appreciation. To these ends, the Company intends to invest its funds primarily in short-term (not more

---

8. At its November meeting the board also voted to create a trust to purchase 550,000 shares of Cayman Re from Scott. This trust was part of Scott's plan to reduce the number of shares held by the original principals. Scott purchased 550,000 shares from the principals, including Thompson. The shares were then placed in trust for Cayman Re in exchange for an $82,500 note, which was to be paid if the warrants were ever exercised and the stock acquired by the public.

At least part of the funds used by Scott to purchase the stock came from the funds he received from Muir for his mysterious consulting activities. An SEC investigator testified that he traced Scott's accounts and checks and concluded that his fees from Muir went toward payment for the shares or to satisfy Cayman Re's past due printing bills.

than six months), fixed income debt securities of major corporate, bank and governmental issuers both within and without the United States.

*Id.* at 23. With respect to investment managers, the prospectus discloses that

the Company may retain one or more investment managers, possibly including the Underwriter, from time to time after the Closing Date to provide it with investment management advice, for which the Company will pay fees or commissions. . . . The amount and type of any compensation to be paid to the Underwriter will be subject to negotiations if and when it is so retained by the Company.

*Id.*

It soon became clear, however, that a sizeable portion of the proceeds was destined not for conservative investment but for purchases of seven new issues underwritten by Muir. On December 28, one day prior to the closing of the offering, Scott and Miller met in Miller's New York hotel.

According to Miller's testimony,[9] Scott told him during that meeting he was being pressured by Dirks and Peterson to buy additional stock and that Dirks was warehousing 1,000,000 Cayman Re shares that could not be sold. Scott also told Miller that he had made compromises with Dirks, which included buying other Muir stocks with Cayman Re's proceeds. Miller, however, never discussed these "compromises" directly with Dirks.

The following day Scott began to elaborate further on the nature of these "compromises." Scott, Miller, Thompson and Roger Corbin ("Corbin"), another of Cayman Re's directors, met at a pre-closing breakfast. Thompson testified that during the meeting Scott disclosed that he was considering a purchase on behalf of Cayman Re of up to $2.5 million worth of Muir-underwritten securities. According to Thompson, Scott stated that he had discussed these proposed purchases with Dirks, although Scott did not say when or where the discussions took place.[10] Thompson testified that he believed that Scott brought the matter up to seek the others' opinions as to the "prudence" of such a move. The group did discuss specific stocks, including Brady Energy and Basic Earth Sciences, but there was no testimony concerning the principals' reaction to the proposed investments.

Later that morning Cayman Re received approximately $4.8 million in net proceeds at the closing, which was attended by Scott, Miller, Thompson, Corbin, Freedman, Wright, Rothman and Peterson. Conspicuous in his absence was Dirks, who apparently was out of town during late December.[11] After the closing was completed and the Muir contingent had departed, Thompson asked the Cayman Re attorneys to remain so that Scott could tell them about the stock purchases. At this point, the testimony of those present at the meeting varies somewhat. Freedman, one of Cayman Re's attorneys, testified that Scott stated that he had made a commitment to Dirks to acquire certain equity securities. Wright similarly testified that some kind of commitment had been made to Muir, at Muir's request, to purchase certain securities. Thompson and Miller, on the other hand, testified that the post-closing discussion centered on the possibility that Scott would make the investments in compliance with Muir's request. In particular, Miller testified that there was no mention of an agreement or commitment to make the purchases, unlike his discussion with Scott on the preceding day.[12]

Upon hearing of Scott's plans for the proceeds, Freedman and Wright advised the

---

9. Miller did not testify at trial. Consequently, the testimony offered and received into evidence is his deposition testimony.

10. In testifying about the same meeting, Miller stated that he did not remember any discussion of an agreement to make the purchases, unlike his conversation with Scott on the preceding day.

11. The parties stipulated that Dirks' mother-in-law, if called to the stand, would testify that Dirks was visiting her in Louisiana during this period and that he was ill from the flu.

12. Unlike Miller, who testified that Scott told him that he had an agreement with Dirks to purchase the stock in return for Muir bringing the company public, Thompson testified that he never was told of any such agreement.

principals, including Scott, against the purchases on the ground that they might be inconsistent with the language of the prospectus. Freedman reiterated this advice in a letter to Scott dated December 29 and suggested that if the purchases were made against this advice, Trubin Sillcocks would have to consider withdrawing its opinion letter.

Wright then contacted Rothman, who apparently was unaware that the investments were being considered, and the following day sent him a copy of Freedman's letter to Scott. After receiving the letter, Rothman spoke to Dirks and learned that the decision to purchase the securities had already been made. Rothman testified [13] that the substance of his conversation or conversations with Dirks was that Cayman Re had decided to buy certain securities and that this action comported with Dirks' own year-end philosophy of trading. Rothman further testified that either Dirks or Peterson told him the names and quantities of the seven stocks that had been ordered. Rothman recognized the seven stocks as Muir-underwritten securities, most of which had been issued in the past six months. In fact, two of the issues went public within 48 hours of Cayman Re's offering. Moreover, Rothman was told either by Dirks or Peterson that Scott had placed the order himself or had been present when the order was placed.

Despite having this information on the purchases, Rothman wrote Freedman on December 30 asking for further details on the investment "your client intend[s] to make...." Plaintiff's Ex. 711 at 2. At the same time, Cayman Re's counsel was operating under the assumption that the order had not been placed and that it would not be made before Cayman Re's board of directors had the opportunity to review the proposal at the January meeting. On December 30, Wright had a conference call with Scott and Mr. McKeller, a Canadian attorney. Wright understood as a result of that conversation that Cayman Re would not buy any of the Muir-underwritten stocks because of the danger that such investments would render the prospectus misleading. He confirmed this understanding in a December 31 letter to Scott, stating his belief that Cayman Re would make no investments in equity securities until the board could consider the issue in January.

Scott, however, did not adhere to this plan of action nor, apparently, did he ever intend to. Even before the offering was closed, the shares of the seven stocks ultimately purchased by Cayman Re were transferred from Muir's inventory into a dummy account, in anticipation of the Cayman Re investment.[14] On December 18, 19 and 23, Muir transferred these shares into the account of Toomex Link Corp. Ltd. ("Toomex"), a new account opened by Peterson on December 19, by taking the shares either from a firm trading account or from an underwriting account of Muir.

The shares remained in the Toomex account only briefly. On January 8 and 9, 1981, the entire contents of the Toomex account, which consisted of these seven stocks, was transferred to the Cayman Re account, which Peterson had opened on December 30. The transfer involved the same number of shares of the same securities at the same prices and at the same "as of" dates that the shares were originally "sold" to Toomex. Moreover, even though Muir purported to charge Cayman Re a commission for the sale, thus bringing the total price of the securities up to $1,664,804.58, the company only paid $1,632,005.00 for the stocks, the exact price charged to Toomex.

The uncontroverted evidence at trial also demonstrated that Toomex never paid for the securities nor were any other trades ever made for that account. It was further established that Toomex itself did not authorize the account to be opened in its name. The Muir new account form lists Martin Sear ("Sear") as the individual dealt with in connection with the opening of the account. Sear, a Toronto attorney who was

---

**13.** Although Rothman could not recall at trial the specific contents of his conversation with Dirks, he did recall his deposition testimony regarding the discussion.

**14.** This information was based upon the testimony of an SEC investigator who traced through the Toomex and Cayman Re transaction records.

president and a director of Toomex, testified that he did not request or approve the opening of the account nor deal with anyone at Muir concerning such an account. Furthermore, Sear testified that he did not even have authority to open a brokerage account in the United States and that to his knowledge Toomex had no such account. In fact, Sear never saw any of the Toomex account statements until the SEC showed them to him in Toronto.[15]

On January 7, 1981 Rothman, Peterson, Freedman, Wright, Frank and another lawyer from Booth Lipton attended a meeting in Rothman's office to discuss the investments. During this meeting Wright apparently learned for the first time that the order had been placed. The discussion at the meeting focused on the propriety of the investments in light of the investment objectives set forth in the prospectus but the possibility of stickering or amending the prospectus to disclose the purchases was not explored. Not surprisingly, the lawyers' recollections of the various positions taken on the issue vary somewhat. For example, while Freedman testified that Rothman was urging him to conclude that the purchases were consistent with the prospectus, and therefore to advise his client to pay for the stock, Rothman evasively testified that he does not remember being asked for his opinion concerning the investments. One cause of worry to Freedman was the liquidity of the stocks. Consequently, at his request, John Sullivan, Muir's managing partner, sent Freedman a letter dated January 7 setting forth the trading volume of each of the securities.[16]

After their January 7 meeting with Peterson and Muir's lawyers, Wright and Freedman called Scott to tell him that he was the "proud owner" of the securities.[17]

According to Freedman, Scott said that it was news to him and that he had not ordered the stocks. Freedman again advised Scott against the transaction, and he repeated that advice in a January 8 letter, which states in part:

This is to confirm our advice to you that we consider this level of investment in equity securities to be inconsistent with the investment objectives set forth in the Prospectus. We believe the prudent course of action at this time would be to liquidate substantially all of the equity positions promptly so that the results can be reviewed at the Board meeting to be held on January 23, 1981. In addition, the Board should resolve at that time the extent and nature of future equity investments in light of the objectives set forth in the Prospectus and the needs of the Company as a new entrant in the reinsurance market.

In light of the requirements of the United States federal securities laws that all material information about a company should be in the public domain, you should consider issuing a press release concerning the Company's investments.

Plaintiff's Ex. 717. A few days later, a Trubin Sillcocks associate wrote to Rothman stating that Scott had decided to sell all the Muir stocks with the exception of Basic Earth Sciences.

On January 23, 1981, the Cayman Re board met and discussed, *inter alia,* the equity investment. Scott reported that $1.6 million of the Cayman Re proceeds had been used to buy seven issues underwritten by Muir. According to Miller and Wright, Scott stated that the investments were part of an agreement or *"quid pro quo"* which he had made with Dirks for bringing Cayman Re public.[18] The board discussed whether

---

**15.** Sear, however, was not unknown to Scott. In fact, Sear was the representative of a seller of a Toronto office building purchased by Scott with the bulk of Cayman Re proceeds. Sear incorporated Toomex to receive part of the return from that sale.

**16.** Freedman requested that the letter come from Muir, not from Peterson or Dirks.

**17.** In his brief, Dirks disingenuously contends that Cayman Re could have walked away from the order on January 7 because the company had not yet paid for the stocks. This contention is obviously at odds with the well settled custom in the securities industry, as well as contrary to black letter contract law.

**18.** Thompson, who was also present at the board meeting, recalled no discussion of an agreement or *quid pro quo.* See note 12, *supra.*

the investments complied with the prospectus as well as whether it was appropriate to invest in stocks underwritten by Muir. Despite these issues, the board voted to ratify the purchases, although the consensus was that the level of investment should be reduced to $1,000,000. Wright noted that the prospectus might have to be stickered or amended in any event and indicated that he would review the matter upon his return to New York.

As a result of that review, Wright concluded that the prospectus need not be stickered because of the board's decision to reduce the size of the investment. Disclosure of the potential conflict of interest raised by investment exclusively in Muir-underwritten stocks apparently was not seriously considered, if at all. After this decision, Trubin Sillcocks' concerns over the securities evidently were resolved. On April 3, the firm filed a form SR with the SEC indicating that the use of the proceeds comported with the prospectus. Moreover, Trubin Sillcocks prepared a certificate, which was signed by Scott and the Cayman Re treasurer and supplied to Muir, stating that there had been no material adverse changes with respect to the use of the proceeds of the offering except as set forth in the prospectus or any amendments thereto.

After the board meeting on February 11, Thompson wrote to Scott and Miller confirming his understanding that the board wanted to liquidate Cayman Re's position in the new issues. Two of the stocks, Digital Switch and Mid Pacific, were sold, but other stocks were then purchased. From December 1980 through August 1981, when Muir collapsed financially and a trustee was appointed to liquidate the company, shares of eleven stock issues were purchased for the Cayman Re account. All eleven stocks were underwritten by Muir and Muir was a market-maker for each.

Meanwhile, despite the brouhaha caused by Cayman Re's equity investments, Scott was busily engaged in misapplying the remaining $3.2 million of the underwriting proceeds. During the summer of 1980, before he became involved with Cayman Re, Scott had discussed the possible purchase of two Toronto office buildings with the clients of Martin Sear, a Toronto attorney who also testified at trial concerning the dummy Toomex account. While Scott initially indicated to Sear that he represented some Canadian clients who might be interested in purchasing the buildings, Sear understood by December of 1980 that financing for the purchase would come from a public stock offering in New York. In addition, Sear was told by Scott that the purchaser would be a company named Marsta Cessions Services Ltd. ("Marsta Cessions"). The only two officers of Marsta Cessions were Nina Quinn ("Quinn") and James Wrightman ("Wrightman"), both of whom were associates of Scott.

On February 4, 1981, Cayman Re and Marsta Cessions entered into an agreement which obligated Cayman Re to provide an unsecured $10 million line of credit to Marsta Cessions. Wrightman and Quinn authorized the transaction for Marsta Cessions, and it appears that the name Michael Scott is signed, albeit somewhat illegibly, on behalf of Cayman Re. On February 5, Sear's client assigned the purchase agreement for the Toronto buildings to Marsta Cessions and Quinn in return for an initial payment of $525,100. Under the agreement, Marsta Cessions held a purchase option on the buildings which was renewable on a monthly basis. By July 26, 1981, Cayman Re, through Scott, had lent on an unsecured basis more than $3 million of its funds to Marsta Cessions to make the monthly payments on the options.[19]

---

**19.** Thompson had approved Scott's January 30, 1981 proposal that Cayman Re act as a surety on an $1.25 million loan in connection with a Toronto real estate deal. Thompson, however, understood that the transaction would merely be an insurance deal and did not authorize an unsecured cash loan.

Although Cayman Re has recovered a portion of the money "lent" to Marsta Cessions, it has not been repaid in full and Marsta Cessions has no other assets with which to make additional payments.

It was not until May and June of 1981, that Cayman Re principals discovered the details of the Marsta Cessions transaction. At its July 23 meeting, the board heard a report about the loan from Scott and resolved to form a committee "to sell, dispose of or otherwise resolve" the company's loan position with Marsta Cessions. Scott also reported that, with the exception of the Aneco and Security American holdings, Cayman Re's stock position had been liquidated.[20] Subsequently, at its August 10 meeting, the board voted to remove Scott from his position in Cayman Re.[21] By that time, however, a private action for damages had already been filed against the company. The Commission later instituted this action in early 1982.

## II.   *General Legal Standard*

Based upon this evidence, the Commission contends that Scott and Dirks are liable for violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5. Section 17(a), which applies only to sellers or offerors, states:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 10(b), which applies to both buyers and sellers, makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Pursuant to its rulemaking power under this section, the Commission promulgated Rule 10b–5, which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

In order to prove its case under Sections 17(a)(1), 10(b) and Rule 10b–5, the Commission must show that (1) the prospectus misrepresented or omitted to state certain facts; (2) the omitted or misrepresented facts were material; and (3) the defendants acted with scienter in causing the misrepresentations or omissions to be made. *Aaron v. SEC*, 446 U.S. 680, 695, 697, 100 S.Ct. 1945, 1955, 1956, 64 L.Ed.2d 611 (1980). The Commission can establish a violation of Section 17(a)(2) or (a)(3), however, by showing merely that the prospectus was materially false or misleading and that the defendants

---

**20.** Scott reported that the equity investment had been liquidated at a loss of approximately $320,000. According to Dirks, the company made a $872 profit on the sale of the portfolio but declared an unrealized loss of $285,500 on two securities, Aneco and Security American, which Cayman Re did not sell. Security Amer-

ican had ceased trading by this time and Cayman Re apparently retained Aneco for takeover purposes.

**21.** On July 31, 1981 Trubin Sillcocks resigned as counsel to Cayman Re.

negligently caused those misrepresentations or omissions. See *id.* at 697, 100 S.Ct. at 1956. In proving these elements, the Commission must persuade the Court by a fair preponderance of the evidence. See, *e.g., Securities and Exchange Comm. v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 102 (2d Cir.1978).[22]

### III.  *Conclusions of Law Concerning Scott*

■ The overwhelming evidence in this case establishes beyond peradventure that Scott violated both Section 10(b) and Section 17(a). Scott's liability is predicated on three factual bases: (1) his undisclosed decision or agreement with Muir to invest one-third of the proceeds of Cayman Re's stock offering in speculative new issues underwritten by Muir; (2) his unrevealed use of the remainder of the proceeds to finance the Marsta Cessions transaction despite the statement in the prospectus that the proceeds were to be invested "principally in liquid fixed income securities"; and (3) his failure to make known his prior fraud conviction in Canada. Because all three of these allegations are supported by far more than a preponderance of the evidence, the Court concludes that Scott caused Cayman Re to sell its securities pursuant to a materially false and misleading prospectus and accordingly violated the antifraud provisions of the securities laws, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.

The record clearly demonstrates that Scott had decided prior to the closing of the offering that he would invest a substantial portion of the proceeds in Muir-underwritten stocks. For example, Miller testified that the day before the closing Scott stated that he had made certain "compromises" with Dirks in connection with Muir's bringing the company public and that the "compromises" included the purchase of other Muir stocks.[23] Scott also mentioned a pre-closing agreement with Dirks or Muir during conversations with Thompson, Freedman and Wright. Moreover, there is evidence that on the morning of the closing Scott discussed with the Cayman Re principals the specific stocks to be purchased, thus negating any inference that the decision to make the investment was reached after the closing.

The Toomex account provides further solid evidence of a pre-closing agreement between Scott and Muir. Clearly the account, which reflects only this single transaction, was used merely as a blind for receiving the securities from Muir's account and holding them until the Cayman Re offering closed and the company had the funds to pay for the stocks. Indeed, the screen could scarcely have been more transparent. The transfer from Toomex to Cayman Re of the same securities in the same quantities, at the same prices and "as of" the same dates that Toomex originally acquired the shares leaves little question about the real motivation for the transaction. This conclusion is further supported by the fact that Toomex's agent neither authorized the account nor knew of its existence.

Although the Commission produced no direct evidence of Scott's involvement with the Toomex account, that inference is unavoidable in light of Sear's testimony. Sear stated that he incorporated Toomex in December of 1980 to receive part of the proceeds from the Marsta Cessions transaction, which Scott engineered. The "coincidence" of Scott's involvement with Toomex and the unexplained and unauthorized opening of the account in the names of Toomex and Sear compels an inference that Scott had a direct hand in the opening of the dummy account.

The evidence is similarly indisputable that Scott both planned for and used the bulk of Cayman Re's proceeds in a manner that was clearly inconsistent with the investment objectives stated in the prospec-

---

**22.** Dirks argues that a violation of the antifraud provisions must be established by "clear and convincing" evidence. The case on which defendant relies, however, has now been overruled by the Supreme Court on that precise point. See *Herman & Maclean v. Huddleston,* —— U.S. ——, ——, 103 S.Ct. 683, 692, 74 L.Ed.2d 548 (1983).

**23.** These statements, of course, are admissible against Scott as nonhearsay pursuant to Rule 801(d)(2), F.R.E.

tus. The Commission not only established that $3.2 million of the proceeds ultimately were lent to Marsta Cessions, in direct contravention of the prospectus, but also that Scott had planned this use of the proceeds prior to the closing. Sear testified that Scott began negotiations for the Toronto office buildings in the summer of 1980 on behalf of unspecified "Canadian purchasers." By December of 1980, Scott had informed Sear that financing for the purchase would come from a public offering in New York. Scott then renegotiated the date for delivery of the $500,000 deposit from December 24, prior to the Cayman Re closing, to February 15. He then used some of the proceeds to satisfy that obligation in addition to making a $550,000 payment. Scott subsequently lent Marsta Cessions another $500,000 of Cayman Re's money for the March 10 payment. By July, Scott had exhausted the entire proceeds.

In addition to Scott's failure to disclose the material changes in the intended use of the proceeds, he also failed to disclose his conviction and subsequent prison sentence for insurance fraud in Canada. The Commission introduced evidence that Scott pleaded guilty in 1961 in Montreal to charges that he had committed fraud while serving as chief operating officer of an insurance company. Not only was this obviously material information withheld from the investors, but Scott actually filed an affidavit to the contrary in support of Cayman Re's application for a reinsurance license.

Based on these facts, there can be no doubt that Scott's acts and omissions rendered the prospectus false and misleading.[24] It is further apparent that there is a "substantial likelihood that disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *TSC Industries v. Northway,*

426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Obviously an investor would consider an apparent kickback agreement between the issuer and the underwriter as material information since such an agreement raises an inherent conflict of interest and undermines the independence of the underwriter's investment judgment. *Cf. Chris-Craft Industries v. Piper Aircraft Co.,* 480 F.2d 341, 370 (2d Cir.) (investing public relies on underwriter to check accuracy of statements and soundness of offer), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). Moreover, the manner in which the company's remaining assets were managed would be of obvious importance to an investor, as would be a criminal record of the company's chief executive officer.

The Court is also convinced that Scott pursued this course of conduct with scienter, thus justifying a finding of liability under Section 10(b) and Section 17(a)(1).[25] His "knowing or intentional misconduct," *Aaron, supra,* 446 U.S. at 690, 100 S.Ct. at 1952, is clear from the record. Not only does the evidence demonstrate Scott's knowledge of the stock purchase agreement, but the subterfuge used in temporarily parking the securities in the Toomex account strongly suggests an awareness of wrongdoing. Moreover, Scott was advised by counsel that the purchases could subject both him and the company to civil and criminal liability. The evidence also makes clear that Scott planned the diversion of the remaining proceeds via the Marsta Cessions loan notwithstanding the utter inconsistency of that use of the funds with the investment objectives stated in the prospectus. Finally, it would be disingenuous to suggest that it was mere negligence for Scott to fail to disclose his prior conviction for fraud. Rather, his execution of an affidavit stating that he had never been convicted of a crime

---

**24.** Scott has filed with the Court a "Statement of Correction to Plaintiff's Pre-Trial Proposed Findings" dated December 13, 1982 and a document with a cover letter dated January 3, 1982 in which Scott attempts to rebut Mastin's testimony. While the Court has considered these submissions, they did not alter the conclusions

reached on the basis of the Commission's evidence.

**25.** These acts obviously contravene Section 17(a)(2) and (a)(3) as well. See *SEC v. Manor Nursing Centers,* 458 F.2d 1082 at 1094–96 (2nd Cir.1972).

indicates a conscious and deliberate intent to withhold that obviously relevant information.

As chief executive officer and director of a public company, Scott had a well-defined obligation to ensure the accuracy of the final prospectus for the benefit of investors, from whom Cayman Re solicited more than $5 million. The evidence adduced by the Commission, however, demonstrates that Scott fell far short of this responsibility. Accordingly, based upon his complete disregard of his duty to the investing public as manifested by his knowing nondisclosure of key information, the Court finds Scott to be liable for violations of Section 17(a), Section 10(b) and Rule 10b-5.

### IV. Conclusions of Law Concerning Dirks

The crux of the Commission's allegations against Dirks concerns Cayman Re's $1.6 million investment in the seven issues underwritten by Muir. Unlike the claims against Scott, the SEC does not assert that Dirks had any involvement with the Marsta Cessions loan or that he was responsible for Scott's failure to disclose his felony conviction. Rather, the Commission's case against Dirks stands or falls on its proof concerning Dirks' knowledge of and state of mind regarding the stock purchases.

Preliminarily, it should be noted that the Court finds the prospectus to be misleading by virtue of omission rather than affirmative misrepresentation.[26] The Commission has asserted that the statements in the prospectus that Cayman Re would invest "primarily in short term fixed securities" and "maintain liquidity" are grossly misleading in light of the stock purchases. The Commission further contends that the statement that Cayman Re may "from time to time" retain investment advisers "possibly including Muir" was rendered false by the existence of the pre-closing agreement between Muir and Scott.

The Court, however, tentatively ruled at trial that those portions of the prospectus were not rendered misleading by reason of the purchases but rather that the prospectus was misleading because of the nondisclosure of Cayman Re's exclusive investment in Muir-underwritten stocks. The evidence showed that Cayman Re used approximately 33 per cent of its net proceeds to make these equity investments. Although that was a substantial fraction of the proceeds, the major portion was still available for investment in short-term debt instruments in accordance with the prospectus. Cf. *Municipal Bond Corporation v. Commissioner of Internal Revenue*, 341 F.2d 683, 688 (8th Cir.1965) (construing "primarily" in context of tax statute as meaning "of first importance or principally"); *Deltide Fishing & Rental Tools, Inc. v. United States*, 279 F.Supp. 661, 670 (E.D. La.1968) (primarily means a numerical plurality). Nor, in the Court's opinion, was Scott's decision to invest in the Muir-underwritten stocks inconsistent with the statement that Muir would from time to time be retained as investment adviser. The significant aspect of Cayman Re's equity investment was not that Muir may have acted as adviser, but rather that all of the stocks purchased were ones in which Muir had a substantial interest. Clearly, any reasonable investor in Cayman Re would have considered significant to the investment decision information that the issuer planned to acquire an equity portfolio consisting entirely of other stocks underwritten by the same underwriter (disclosed as a possible investment adviser) especially when those securities were ones which the underwriter had previously been unable to sell and had in the firm's account. Accordingly, the Court concludes that the failure to disclose that important conflict of interest caused the prospectus to be misleading. The question with respect to Dirks is whether he can be charged with responsibility for this omission.

In support of its contention that Dirks violated Sections 17(a) and 10(b), the SEC sets forth three factual bases for liability: (1) that Dirks entered into an undisclosed

---

**26.** The one exception to this ruling, which does not apply to Dirks, is that Scott's use of the bulk of the proceeds in the Marsta Cessions transaction rendered the statement as to the use of the proceeds affirmatively misleading.

agreement with Scott prior to the Cayman Re closing to commit the company to the purchase of the securities as a *quid pro quo* for Muir's taking the company public; (2) that even if Dirks did not insist on the purchases as a condition of the underwriting, he knew that Scott had arranged prior to the closing to acquire the stocks and failed to insist upon the disclosure of that arrangement in the prospectus; and (3) that even if Dirks did not know of the other purchases prior to the closing, he undeniably knew on December 30 that the order had been placed yet he failed to have the prospectus stickered or amended to reflect them during the 90-day period in which Muir was obligated to supply the prospectus. Each of these positions will be addressed in turn.

A. Dirks' Alleged Agreement with Scott

The Commission charges that Dirks effectively engineered Cayman Re's equity investment in the Muir stocks by insisting that the purchases be made as a *quid pro quo* for the underwriting. Although the Commission was unable to submit direct proof of Dirks' involvement, there were certain out-of-court statements offered against Dirks as exceptions to the hearsay rule as well as other evidence from which, the Commission argues, an inference of Dirks' knowledge and/or participation may be drawn.

Dirks initially contends that the Commission has failed to produce sufficient evidence that an agreement existed at all, much less an agreement between Scott and him. Dirks characterizes the evidence of an agreement as a mere inference drawn from the fact that the purchases were made. Defendant further argues that this inference is negated by the seeming incongruity of such an agreement in light of the prior disclosure and abandonment of the arrangement that Muir would act as investment

manager for one-third of the proceeds. According to Dirks, if Muir had truly been intent on getting control of a portion of the proceeds, the underwriter would not have given up its fully disclosed position as investment adviser.

While Dirks' argument does suggest a possible inconsistency in Muir's actions,[27] he conveniently overlooks the existence of the Toomex account, which provides the critical proof evincing a pre-closing agreement between Muir and Scott. The opening of this dummy account days before the Cayman Re closing for the sole purpose of housing the stocks eventually purchased by Cayman Re clearly demonstrates that Scott and someone at Muir arranged for Cayman Re's acquisition of the stocks long before the closing. It is this evidence, and not merely the fact that Cayman Re acquired the securities that leads the Court to believe that Scott agreed with Muir prior to the closing to purchase the stocks in question. The further issue to be resolved, of course, is whether Dirks had personally negotiated the agreement with Scott or had otherwise acquired knowledge of the agreement before the closing.

The Commission offered the following evidence connecting Dirks to the pre-closing agreement with Scott:

(1) Miller's testimony that on December 28 Scott stated that under pressure from Dirks he had agreed to purchase Muir stocks in reasonable quantities;

(2) Miller's memorandum of his December 28 meeting with Scott (Plaintiff's Ex. 103);

(3) Freedman's and Wright's testimony that immediately after the December 29 closing Scott stated that he had made a commitment to Dirks to purchase certain securities in order to get the offering closed;

**27.** Muir's willingness to abdicate its position as investment adviser is not inconsistent with the Scott-Muir agreement. Obviously, if Muir had been assured that Cayman Re would invest one-third of its proceeds in a manner benefiting Muir, there would be no reason for Muir to seek control of those funds as investment ad-

viser. Indeed, it may have seemed to Scott and Muir that the underwriter should not be named as adviser where the entire equity funds were to be placed in stocks in which Muir had an interest. This is not to say, however, that Dirks arranged for this agreement on behalf of Muir.

(4) Miller's testimony that Scott stated at the January 23 board of directors' meeting that he purchased the stocks as a *quid pro quo* for Dirks' agreement to bring Cayman Re public; and

(5) Thompson's testimony that Dirks had made a commitment personally to oversee the offering and had been involved in offering Cayman Re investment advice before Muir's investment contract was terminated, in addition to other evidence tending to show Dirks held a supervisory position in the Cayman Re underwriting.

█ Clearly, the most damning evidence linking Dirks to the agreement is Scott's hearsay statements. Equally obvious is the fact that these statements are not admissible against Dirks for their truth, *i.e.,* to show his involvement in the agreement, unless the Court finds that the statements come within one of the exceptions to the hearsay rule. At trial, the Court rejected the Commission's argument that the statements attributed to Scott were admissible against Dirks pursuant to Rule 801(d)(2)(E), F.R.E., as statements by a co-conspirator in furtherance of the conspiracy. See Transcript, pp. 612–14, 617. Conversely, the Court ruled preliminarily that Miller's testimony concerning Scott's statements as well as his memorandum, Plaintiff's Exhibit 103, would be admitted pursuant to the catchall exception, Rule 804(b)(5), F.R.E. Upon fuller consideration, however, the Court has determined that the evidence must be excluded against Dirks because there are no independent circumstantial guarantees of trustworthiness, see *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), sufficient to justify its admission in the interests of justice.[28]

Scott has, as the evidence abundantly shows, an inherently untrustworthy character. He has shown no reluctance to lie directly about the existence of certain facts, such as his prior fraud conviction, whenever this serves to further his own ends. Thus, for the Court to accept a hearsay statement attributable to Scott as evidence against a third-person, the independent circumstantial guarantees of trustworthiness must be quite substantial. Since Scott's statements implicating Dirks also serve to involve Scott himself as a party to an illegal agreement, they are, facially, admissions against Scott's penal interest. While this fact could serve as the basis for an independent hearsay exception under Rule 804(b)(3), F.R.E., the Court need not rest its conclusions against Dirks on that basis in light of the findings in Part B, *infra*.

Moreover, the Court is loath to rely on Scott's statements as evidence against Dirks because there exist enough other plausible explanations for Scott's statements to render them ambiguous as far as his interests are concerned. Although the statements evince Scott's participation in a pre-closing agreement, they could also have served to justify his actions to the principals of Cayman Re and others who might have questioned his behavior in investing a portion of the offering proceeds in speculative new issues. By essentially saying "Dirks made me do it," Scott provided insulation from his own failing in the event that the investments proved to be unsuccessful.

---

**28.** Dirks also argues that the statements must be excluded because the Commission failed to give notice prior to trial of its intention to offer the hearsay against Dirks pursuant to Rule 804(b)(5). Although the SEC did announce its plans to offer Miller's statements against Dirks for their truth, Dirks contends that the Commission was required to reveal its intention to rely specifically on Rule 804(b)(5), F.R.E. While this position is not without support in this Circuit, see, *e.g., United States v. Ruffin,* 575 F.2d 346, 358 (2d Cir.1978), there is also authority holding that a failure to give prior notice is cured by the trial court's offer to grant a continuance. See *United States v. Medico,* 557 F.2d 309, 316 n. 7 (2d Cir.1977); *United States v. Muscato,* 534 F.Supp. 969 (E.D.N.Y. 1982) (Weinstein, J.). In the present case, where the Commission prior to trial gave notice of its intent to offer Miller's hearsay statements and where the Court granted Dirks a continuance of more than two weeks between the Commission's case and his own, the Court believes that the notice requirement of Rule 804(b)(5), F.R.E., has been adequately complied with. The Court need not finally resolve this question, however, since the hearsay lacks substantial guarantees of trustworthiness and therefore must be excluded.

The SEC contends that there are two independent sources of nonhearsay evidence, the Toomex account and Rothman's testimony that Dirks told him on December 29 or 30 that the stocks had been ordered, that support Scott's statements concerning an agreement with Dirks. Clearly, the Toomex account itself does not corroborate an agreement with Dirks since there is nothing about the account that directly suggests Dirks' involvement. Nor does the fact that Dirks knew on December 29 or 30 that Cayman Re had ordered the stocks indicate that he had a pre-closing agreement with Scott concerning the purchases. There is absolutely no evidence to connect Dirks' knowledge at the closing with his alleged involvement prior to that time, and thus to draw the inference that the SEC suggests would be sheer speculation rather than a logical inference.

The SEC further contends that Scott's statements, as attributed by Miller, are reliable because he told essentially the same story at other times to Thompson, Freedman and Wright. That repetition, however, does not strike the Court as constituting evidence that Scott was telling the truth, especially in light of his total lack of credibility. Fabrications, of course, can be repeated as easily as actual fact and the Court cannot ignore Scott's track record for duplicity nor his incentive to pass the responsibility for the purchases off on someone else. Indeed, according to the Commission's own evidence, Scott falsely swore that he had never been convicted of a criminal offense when in fact he had served time for fraud, an offense which in and of itself undermines his credibility. Furthermore, the evidence at trial made clear that Scott repeatedly lied to the Cayman Re principals about various matters, not the least of which was the Marsta Cessions transaction, and also that he lied to Cayman Re's attorneys in connection with whether he would make the purchases.

Given these instances proving Scott's lack of veracity, the Court can hardly admit his hearsay statements on the ground that he repeated the statements to others. Moreover, not all of Scott's various versions of the purchases were identical. For example, Scott told Miller on December 28 that he had agreed to the purchases while the next day he told a group of the Cayman Re principals merely that he was considering the purchases. In light of this lack of consistency, it is unclear when, if ever, Scott was giving a straightforward account of events. The Court is acutely aware that since Dirks, Scott and Peterson all invoked their Fifth Amendment privileges and refused to testify, Scott's hearsay statements are more probative of Dirks' personal involvement with the pre-closing agreement than any other evidence the Commission reasonably could have procured. Because of these serious doubts about Scott's credibility, however, this Court cannot admit his hearsay statements for their truth against Dirks pursuant to the catchall exception. To do so would have the effect of basing Dirks' liability on the hearsay statements of an inveterate liar and convicted con artist.

In the absence of Scott's hearsay statements, there is no evidence tending to show that Dirks was involved in an agreement with Muir.[29] Accordingly, the Court rejects the Commission's first factual basis for Dirks' liability.

## B. Dirks' Knowledge of the Purchases Prior to the Closing

■ The Commission alternatively argues that even if Dirks did not extract an agreement from Scott as a *quid pro quo* for taking Cayman Re public, Dirks knew or should have known prior to the closing that Cayman Re had placed the securities order and therefore should have ensured that the prospectus disclosed the nature of such purchases. For the reasons stated below, the Court finds that an inference that Dirks knew of the purchases prior to the closing is warranted by a preponderance of the evidence.

---

**29.** Obviously, the mere fact that Dirks had a supervisory or lead position at Muir in connection with the Cayman Re offering cannot by itself support an inference that Dirks was a party to the creation of the Toomex account or to the undisclosed agreement between Scott and Muir.

The testimony at trial of Muir's lawyer revealed that Dirks knew about the purchases either the day of the closing or immediately thereafter. Rothman testified that Dirks told him on either December 29 or 30 that Cayman Re had decided to buy certain securities and that this action comported with Dirks' own year-end philosophy of trading. In testifying about the conversation, Rothman was unclear as to the exact date on which the conversation took place; he recalled only that he spoke to Dirks after receiving a copy of Trubin Sillcocks' December 29 letter to Scott advising him not to make the purchases and before Rothman drafted his own December 30 response to that letter. Rothman further testified that either Dirks or Peterson told him the names and quantities of the stocks which had been ordered as well as the fact that Scott had placed the order or had been present when the order was placed.

Rothman's testimony thus establishes at the least that Dirks knew on December 30 that Cayman Re was purchasing the securities. That testimony, however, further suggests that word of the purchases was not news to Dirks. For example, Dirks' statement to Rothman that he viewed the purchases as consistent with his own year-end philosophy of trading suggests that he had been consulted on the purchases and had evaluated them. Similarly, although Rothman could not remember whether Dirks or Peterson gave him the details of the purchase, Dirks' statement to Rothman that the securities would provide Cayman Re with capital appreciation indicates that he knew what the precise purchases were.

It is inconceivable to the Court that Dirks was not aware of these facts prior to the closing, given his apparent familiarity with the situation by the 30th, the size of the investment and his position of responsibility in connection with the underwriting. The record unambiguously demonstrates that Dirks not only was involved in all aspects of the underwriting but also that he was in charge of the offering for Muir. When the principals first approached Muir about the underwriting they sought out Dirks, with whom they did the initial and substantial planning for the offering. When a problem arose in working with Muir employees, the principals turned to Dirks.[30] When changes had to be made in the underwriting it was Dirks who contacted the principals just as it was Dirks who paved the way for Scott's entry into Cayman Re. These factors, in addition to Dirks' personal commitment to oversee the underwriting, demonstrate quite simply that Dirks was running the show.

As borne out by the evidence, Dirks' commitment was not an empty promise. His participation and handling of every major event during the long course of preparations for the underwriting is apparent. Thus, the Court cannot believe that Dirks was unaware that Cayman Re, through Scott, had decided to invest one-third of the entire proceeds of the offering in stocks in which Muir had a direct interest. Despite Dirks' suggestion to the contrary, a decision to invest $1.6 million is not made casually, particularly when an obvious issue of conflict of interest is raised. In drawing this inference concerning Dirks' knowledge, the Court recognizes that a position of responsibility cannot be translated into an automatic basis for liability and that subordinates may take actions that are unknown to their superiors. This case, however, does not present such a situation. It is not merely Dirks' position that compels the inference of his knowledge but rather the combination of his statements to Rothman, his personal involvement in the underwriting, the size of the investment, and the fact that only Muir-underwritten, Muir-owned stocks were involved that lead the Court to the inescapable conclusion that Dirks must have been informed of Scott's decision to make the purchases prior to the sale of the Cayman Re issue to the public, and that he failed to insist on the disclosure of that information, with the result that Cayman Re sold its securities pursuant to a materially misleading prospectus. As stated by Judge Learned Hand in another context

---

**30.** For example, when the Cayman Re principals had problems with Sterling, they asked Dirks to have him removed from the project.

Similarly, when Thompson felt that Peterson was pressuring him to buy additional units he turned to Dirks for assistance.

" ... the cumulation of instances, each explicable only by extreme credulity or professional inexpertness, may have a probative force greater than any one of them alone." *United States v. White,* 124 F.2d 181, 185 (2d Cir.1941), cited in *SEC v. Manor Nursing Centers, supra,* 458 F.2d at 1096.

The Court further concludes that Dirks acted with the scienter necessary to render him liable under Section 17(a)(1), Section 10(b) and Rule 10b–5. The Supreme Court has defined scienter as "knowing or intentional misconduct," *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976), or a "mental state embracing intent to deceive, manipulate or defraud." *Aaron, supra,* 446 U.S. at 686, n. 5, 100 S.Ct. at 1950, n. 5. Moreover, in cases in which the defendant owes a special duty to the plaintiff, the Second Circuit has ruled that recklessness satisfies the scienter requirement. See *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

In the present case, Dirks, as the principal representative of the underwriter, had an obvious responsibility to ensure both the soundness of the offer and the accuracy of the prospectus. See *Chris-Craft Industries, supra,* 480 F.2d at 370 (no greater reliance in self-regulatory securities system is placed on participant other than underwriter to verify correctness of published materials). Because of this well-settled obligation on the part of the underwriter, the Court could readily conclude that the recklessness standard would suffice in these circumstances. The Court need not rest its decision on that ground, however, since the evidence clearly permits an inference of Dirks' knowing misconduct.[31] As explained above, the Court concluded that Dirks knew about the purchases prior to the public sale and he certainly knew that these purchases of Muir stock were not disclosed in the final prospectus. Moreover, from his extensive experience in such matters and his reviews of prior drafts of the prospectus Dirks was also aware of Muir's obligation to disclose fully any potential conflicts of interest as well as all forms of compensation to be received by Muir from Cayman Re. This awareness is underscored by the fact that the Commission had requested greater disclosure of Muir's potential conflict as investment adviser in earlier drafts of the prospectus. Therefore, in light of Dirks' knowledge of the purchases and his awareness of the need for full disclosure of any potential conflict of interest, the Court determines that a finding of scienter is supported by the record.[32]

■ This conclusion is bolstered by the fact that Dirks exercised his Fifth Amendment privilege and chose not to testify during the course of this case. While Dirks contends that the Commission failed to produce sufficient admissible evidence to shift the burden of production to him, it is well-recognized that evidence of knowledge and intent is often circumstantial rather than direct. See *Rolf, supra,* 570 F.2d at 47. This is especially true where, as here, the persons who normally would be able to testify about key events have asserted their Fifth Amendment right to remain silent. Although the Court did not consider Dirks' invocation of the Fifth Amendment in determining whether the Commission established a *prima facie* case of liability, *cf. Vanity Fair Paper Mills, Inc. v. Federal Trade Commission,* 311 F.2d 480, 486 (2d Cir.1962), an adverse inference may be drawn against parties to civil actions when they refuse to testify in response to probative evidence offered against them. *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1975).[33] In this

---

**31.** The Court also finds that this conduct violated Section 17(a)(2) and (a)(3).

**32.** Dirks argues only that there is no evidence from which to infer his knowledge. Although Dirks contends that his reliance on counsel negates a finding of scienter with respect to his failure to sticker the prospectus, he cannot raise that defense regarding his pre-closing failure to disclose the purchase since Muir's counsel was not apprised of the situation prior to the closing.

**33.** Dirks argues that the Court should not draw a negative inference from his failure to testify on the ground that the Commission's proof is insufficient to shift the burden of production to him. The Court has ruled, however, that the burden did shift to Dirks, a ruling which the Court communicated to Dirks at trial. Defend-

case, the negative inference which flows from Dirks' decision to remain silent, while not necessary to the Court's findings, provides further support for the conclusion that he violated the securities laws by his knowing failure to disclose Cayman Re's purchases of the Muir-underwritten stock.[34]

C.   Failure to Amend the Prospectus

█ As a further basis for finding Dirks liable for violating Sections 17(a) and 10(b), the Commission claims that he deliberately failed to have the prospectus amended or stickered to reflect the purchases during the 90-day period after the effective date during which Muir was obligated to supply the prospectus to investors.   There is no dispute that developments which occur after the effective date of a registration statement and which materially alter the information presented in the statement must be brought to the attention of public investors.   See *SEC v. Manor Nursing Centers, supra,* 458 F.2d at 1095.   Indeed, "[t]he effect of the antifraud provisions of the Securities Act (Section 17(a)) and of the Exchange Act (Section 10(b) and Rule 10b–5) is to require the prospectus to reflect any post-effective changes necessary to keep the prospectus from being misleading in any material respect...." *SEC v. Bangor Punta Corp.,* 331 F.Supp. 1154, 1160 n. 10 (S.D.N.Y.1971), *cited in SEC v. Manor Nursing Centers, supra,* 458 F.2d at 1096. While Dirks clearly cannot contend that he did not know about the purchases at least by December 30, he argues that his reliance on counsel to resolve the disclosure issue negates any inference that he acted with scienter or that he was negligent in failing to ensure that the prospectus was amended.

█ Initially, to the extent that the Court concluded, *supra,* that Dirks knowingly failed to disclose the purchases prior to the closing, his lack of good faith precludes him from relying on this defense. See *SEC v. Manor Nursing Home Centers, supra,* 458 F.2d at 1101.   Moreover, by not informing his counsel about the purchases until after the closing, Dirks failed to apprise his counsel of all the material facts and therefore cannot rely on his counsel's advice to shield him from culpability.   See *SEC v. Savoy Industries, Inc.,* 665 F.2d 1310, 1314 n. 28, (D.C.Cir.1981), citing *SEC v. Manor Nursing Centers, supra,* 458 F.2d at 1101–02.   Even assuming, however, that Dirks did not learn of the purchases until after the closing, the Court finds that his failure to prove that he asked for, received and acted on the advice of counsel regarding disclosure of the purchases precludes his defense of reliance on counsel.   Accordingly, the Court concludes that Dirks is liable under Section 17(a), Section 10(b) and Rule 10b–5 for failing to amend the prospectus to reflect Cayman Re's investment in the Muir-underwritten stocks.

The heart of Dirks' claim that he relied on Muir's counsel to deal with the question of disclosing the purchases is that after he discussed the investment issue with Rothman on December 30 he understood that the lawyer would handle the matter.   Dirks maintains that having relayed the information about the purchases to Muir's lawyer, he had taken all the steps that would be expected of a reasonable layman.   The securities laws, however, require more of a person in Dirks' position.   The courts that have recognized the defense of reliance on counsel have required proof that the defendant (1) made a complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that the action would be legal; and (4) relied in good faith on that advice.   See *SEC v. Savoy Industries, Inc., supra,* 665 F.2d at 1314 n. 28 (citing cases). Moreover, the fact that a defendant justifi-

---

ant further argues that it would be unreasonable to expect him to waive his privilege in light of the grand jury investigation into the John Muir firm, a contention that does nothing to persuade the Court against the inference.

**34.**  Because the Court finds Dirks liable for violating the securities laws on the basis of his own acts and omissions, it is not necessary to reach the Commission's additional assertion that Dirks is derivatively liable for Peterson's violations as a controlling person pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, or under the theory of *respondeat superior.*

ably relied on advice of counsel in taking the unlawful action has not been viewed as an automatic defense to liability but rather has been regarded as only one factor considered in determining the propriety of injunctive relief. See, *e.g., SEC v. Manor Nursing Centers, supra,* 458 F.2d at 1101–02; *SEC v. Harwyn Industries Corp.,* 326 F.Supp. 943, 955–56 (S.D.N.Y.1971).[35]

Even assuming, however, that Dirks' reliance on counsel could serve as a total defense to liability, there is simply no evidence that Dirks asked for and received Rothman's informed opinion concerning the need to disclose the purchases. Rothman testified only that Dirks told him that Cayman Re had decided to purchase certain securities and that the purchases were consistent with Dirks' trading philosophy. Although Rothman recognized the securities as ones that had been underwritten by Muir, there is no indication that he was ever informed that the stocks came entirely from Muir's inventory. Rothman further testified that he does not recall ever being asked for his opinion about the purchases. While Freedman testified that Rothman stated at the January 7 meeting that he believed the purchases were consistent with the prospectus, there is no evidence that Rothman ever communicated this opinion to Dirks or that Dirks ever questioned Rothman about the investment issue subsequent to their December 30 conversation.

Under cross-examination by Dirks' counsel, Rothman admitted that his firm had done nothing to question the validity of Trubin Sillcocks' certificate stating that the proceeds had been invested pursuant to the prospectus. The reliance-on-counsel defense, however, does not mean that one can totally abdicate responsibility by consulting counsel. The fact that Muir had counsel does not relieve the underwriter of its obligations under the securities law, as Dirks'

position seems to suggest. Although Dirks asserts in his brief that he understood that Rothman was exploring the investment issue and that the lawyer had concluded at the January 7 meeting that there was no need for further disclosure, the record is devoid of evidence supporting such an inference. Furthermore, even if Dirks did believe that Rothman was handling the matter, the reliance-on-counsel defense requires more than such a complacent attitude. A defendant must establish that he actively sought and relied on the advice of counsel, a showing that cannot be made on this record, especially in light of Dirks' failure to offer his testimony on the issue.

Accordingly, based on the record before it, the Court cannot find that Dirks has proved the defense of reliance on counsel. In the absence of such a defense, it is clear that Dirks knowingly failed to arrange for disclosure of a material fact by way of a sticker on the prospectus and that his failure to do so renders him liable for violating Section 17(a), Section 10(b) and Rule 10b–5. The Court next will turn to a consideration of the propriety of equitable relief as a remedy for these violations.

### V. *Equitable Remedies*

#### A. General Legal Standard

■ The Commission seeks permanent injunctive relief against both Scott and Dirks pursuant to Section 20(b) of the Securities Act and § 21(d) of the Exchange Act, both of which provide that "upon a proper showing a permanent or temporary injunction or restraining order shall be granted...." In determining whether a proper showing has been made, the Court must find a reasonable likelihood that past wrongdoing will recur, see *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18 (2d Cir.1977). To make this showing the Commission is required to go

---

**35.** *Harwyn Industries* demonstrates the insufficiency of Dirks' proof on this issue. There the court held that it would not issue a preliminary injunction to remedy the defendants' failure to register certain transactions under the Securities Act where the defendants had relied in good faith on counsel's explicit advice not to register and where the SEC had been partially

responsible for the uncertainty over the need for registration because of the ambiguity of SEC releases. 326 F.Supp. at 955–57. Moreover, the Court noted that defendants' counsel had contacted the Commission directly concerning the question and had received no response. See *id.* at.956–57. Clearly, Dirks has failed to make a comparable showing here.

beyond the mere facts of past violations, see *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100 (2d Cir.1978), and prove that a violator has a propensity to engage in future violations. See *id.* at 99. This showing is not precluded, however, by the fact that the illegal activity has ceased. See *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir.1975).

Additional factors that weigh in the Court's determination include (1) the degree of the scienter involved; (2) the sincerity of the defendant's assurances against future violations; (3) the defendant's recognition of the wrongful nature of his conduct; and (4) the degree to which the defendant's professional occupation will affect the chance of recurring violations. See *SEC v. Universal Major Industries,* 546 F.2d 1044, 1048 (2d Cir.1976). Unlike a nonstatutory injunction, there is no requirement that the Commission demonstrate irreparable injury or lack of any adequate remedy at law. See *SEC v. Management Dynamics, Inc., supra,* 515 F.2d at 808. The Court, however, will engage in the traditional balancing of the equities before issuing an injunction. *SEC v. Geon Industries, Inc.,* 531 F.2d 39, 54–55 (2d Cir.1976).

**B. Equitable Relief Against Scott**

■ Applying these principles to the instant facts, the Court has no hesitancy in concluding that Scott should be permanently enjoined from future violations of Section 17(a), Section 10(b) and Rule 10b–5. It is clear to the Court from Scott's blatant disregard for the securities laws, his past conviction for fraud and his many misrepresentations to the Cayman Re principals that there is a substantial likelihood that Scott is prone to future violations. Not only has Scott exhibited no recognition of the seriousness of his breach of responsibilities to the Cayman Re investors, but the degree of his scienter, as evidenced by his rejection of counsel's advice against the purchases, persuades the Court that injunctive relief is necessary.

The Court further has determined to grant in part the Commission's request that Scott be required to disgorge all of the proceeds he received in connection with the Cayman Re offering. While neither the Securities Act nor the Exchange Act specifically authorizes this ancillary relief, it is well established that a district court may order disgorgement to ensure the effective enforcement of the federal securities laws. See, *e.g., SEC v. Manor Nursing Centers, supra,* 458 F.2d at 1104. In order to effectuate the disgorgement, Scott shall submit to an accounting to verify certain financial representations he has made thus far in the litigation.

The Court, however, will not order that Scott disgorge the Cayman Re shares which he holds in trust or the $82,500 note. The Commission may seek other than injunctive relief, "so long as such relief is remedial relief and not a penalty assessment." *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1308 (2d Cir.1971). While Scott may have purchased the stock, and thereby obtained the note, with money supplied by Muir under somewhat questionable circumstances, he did not receive them as proceeds of the offering. The basis for Scott's liability in this case is his failure to disclose material facts to the investors, not his financial arrangements with Muir. Although private plaintiffs may be entitled to this relief against Scott, the Commission's request here would clearly constitute a penalty assessment, which this Court may not order. See *id.*

However, Scott will be enjoined from future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Scott further will be ordered to submit to an accounting and to disgorge all of the proceeds received from the Cayman Re offering.

**C. Equitable Relief Against Dirks**

■ Unlike the Court's decision to enjoin Scott, the determination of whether injunctive relief is appropriate against Dirks is complicated by the collateral consequences attendant to such an injunction. As the Commission candidly noted at trial, the entry of a permanent injunction could be used by the SEC as the predicate for an adminis-

trative order banning Dirks from the securities industry. And, although the Court means to cast no aspersions upon the good faith of the Commission, it is clear that there is no love lost between the SEC and Dirks.

Dirks emphatically maintains that there is no probative evidence that he is likely to engage in future violations of the securities laws. In addition to the evidence of the instant violation, the Commission has pointed to (1) Dirks' 1967 private censure by the New York Stock Exchange for the purchase and sale of securities without the use of a member organization; (2) the finding that Dirks violated the antifraud provisions of the securities laws in connection with the *Equity Funding* matter; and (3) the recent initiation by the Commission of an administrative proceeding against Dirks for alleged violations of the net capital requirement. In contrast, Dirks has offered the testimony of two securities lawyers who, on the basis of having dealt with Dirks on a number of underwritings, testified that his character for abiding by the securities laws, especially the disclosure requirements, is exemplary.

Clearly, the evidence in this case of Dirks' knowing failure to disclose Muir's conflict of interest in connection with the Cayman Re investment requires a remedy that will guard against future violations. To this end, the Court considers it appropriate that Dirks disgorge all of the proceeds he obtained from the Cayman Re offering and submit to an accounting in order to calculate those proceeds. However, in view of the Court's broad discretion to grant or deny injunctive relief, see *SEC v. Manor Nursing Centers, supra,* 458 F.2d at 1100, I have determined that Dirks should not be subject to a permanent injunction. Based on this record, the Court is unable to find a reasonable likelihood that, absent an injunction, Dirks would be likely to commit future violations of the securities laws. Rather, it appears to the Court that the grave collateral consequences of an injunction under these circumstances, see *SEC v. Geon Industries, supra,* 531 F.2d at 54–55, would result in punishing Dirks instead of merely deterring him. *Cf. id.*

In reaching the conclusion that there is no showing of likelihood of repetitive violations, the Court has considered relevant only the evidence of Dirks' instant violation and his 1967 censure. The fact that the Commission has recently instituted administrative proceedings against Dirks is unpersuasive since those allegations have yet to be established. Furthermore, the Court is unswayed by the evidence of Dirks' liability in the *Equity Funding* matter. As the ongoing litigation in that case makes clear, there is room for considerable doubt as to whether Dirks' actions are culpable under the securities laws. See Brief of the United States As Amicus Curiae in Support of Reversal, *Dirks v. SEC,* No. 82–276 (Supreme Court).

Despite the Commission's contention that Dirks engaged in a continuous course of fraud in this case by failing to disclose the Cayman Re purchases, the Court made no such finding. Dirks' liability is premised on the fact that he knew of the purchases and failed to disclose them despite his knowledge that the information would be material in light of Muir's obvious conflict of interest. While culpable, this violation does not in and of itself suggest that Dirks would fail to make full disclosure in the future, especially in light of the testimony concerning his history of adherence to the disclosure laws. Nor is there any admissible evidence that Dirks, unlike Scott, participated in setting up the fictitious Toomex account, or that he lied about various events or that he directly contravened counsel's advice concerning the purchases. Accordingly, the Court does not believe that the level of Dirks' scienter is comparable to Scott's flagrant disregard for the law, which necessitated the entry of a prophylactic injunction.

Rather, the Court is persuaded that the finding of liability together with the order of disgorgement and the cost and publicity attendant to the defense of this action provide ample deterrence against any future misfeasance on the part of Dirks. While the Court is aware that a finding of liability without issuance of an injunction is a somewhat unusual result, where equitable relief

is sought the Court has an obligation to weigh the need for an injunction against the hardship it would create. See *SEC v. Geon Industries, supra,* 531 F.2d at 55; *cf. SEC v. Commonwealth Chemical Securities, Inc., supra,* 574 F.2d at 101 (denying injunctive relief against two defendants despite participation in unlawful closing where trial court concluded that defendants would "shy away" from similar situations in the future). As stated by Justice Douglas in *Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944):

> The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

*Cited in SEC v. Geon Industries, supra,* 531 F.2d at 56. Because the Court finds that the need for an injunction is minimal given the unlikelihood of repetition and the influence of other deterrent factors and that the hardship of an injunction is potentially quite severe in light of the chance that Dirks could be barred from his livelihood, no injunction shall issue against him.

*Conclusion*

Based on the Court's finding that Scott violated the antifraud provisions of the securities laws and that there is a reasonable likelihood that he may violate those statutes in the future, the Court will enjoin him from future violations. While the Court also finds Dirks liable for transgressing Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, no injunction shall issue against him for the reasons stated above. Both defendants, however, shall submit to an accounting and thereafter disgorge all proceeds obtained from the Cayman Re offering.[36] The Commission is directed to submit the judgment in five days on five days' notice to defendants.

SO ORDERED.

---

**36.** During the Court's consideration of this decision the Commission notified the Court that Dirks has filed for bankruptcy. Both the SEC and Dirks agree that Dirks' petition for bankruptcy has no effect upon the instant proceeding. However, to the extent that Dirks may retain control of any proceeds subject to the disgorgement order, those assets are not to be transferred, sold or otherwise disposed of.